## THE VILLAGE OF MARSEILLES

*v.*

## GEORGE HOWLAND.

*Filed at Ottawa May 9, 1888.*

1.  HIGHWAYS—*commissioners of highways—of their powers within an incorporated city, town or village.*   Commissioners of highways have no jurisdiction whatever over highways or bridges within an incorporated city, town or village.   They can not levy a tax to build or repair bridges within an incorporated town, and have no right to exercise any control or supervision over such bridges.

2. SAME — *safe condition of streets* — *duty and liability of corporate authorities in respect thereto.* The charter of a village conferred upon the municipality the power to regulate, grade, pave and improve the streets and alleys within its limits, and to levy taxes and borrow money to improve the streets: *Held*, that under these powers it was the duty of the village authorities to keep all the streets and highways in the corporation in a reasonably safe condition for the use of the public, including the bridges therein, and this, notwithstanding the commissioners of highways may have assumed to control and repair the same, or any part thereof.

3. SAME — *in case of a toll bridge becoming free to the public* — *duty devolving upon municipal authorities in respect to its safe condition.* A toll bridge company sold its bridge to the commissioners of highways of the town in which it was situated, and the company ceased to exist. The bridge thereupon became free to the public, and, being located within an incorporated village, the village authorities had the right to control, improve and repair the same, to the exclusion of the commissioners of highways; and the assumption of the control of the bridge by the latter did not deprive the village of its rights, or relieve it from its duties in respect thereto.

4. SAME — *dedication* — *acceptance* — *rights and powers of municipality* — *of its action as affecting its liability.* Incorporated cities and villages have the power, by proper action, to refuse to accept an attempted dedication of a street or highway.

5. But where a toll bridge has been constructed over a stream in a public street, and the bridge company surrenders its franchise and rights, and the bridge becomes free to the public, and is used by the public, no formal acceptance of the dedication is required of the village in order to hold it responsible for the safety of the bridge, as would be required in the case of a new street.

6. In such case, the village may avoid liability for not keeping such bridge in repair, but some affirmative action on its part is necessary to show that intention. It might condemn the bridge as a nuisance, and close it up, or vacate the street upon which it is located. If it takes no action, but suffers it to be used as part of the street, it must see that it is kept in a safe condition, or be liable for an injury from its neglect of duty.

7. SAME — *the particular case.* Under a private charter, a bridge company, by authority of law, built a toll bridge in a public street of an incorporated village, which it kept up for many years. Finally the company surrendered its rights, and the bridge was left to the free use of the public, the commissioners of highways assuming its control; but the same was suffered to get out of repair, whereby a person, without fault on his part, received a personal injury, for which he sued the village: *Held*, that the village, by suffering the bridge to be used by the public without seeing that it was safe, became liable for the injury.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of La Salle county; the Hon. CHARLES BLANCHARD, Judge, presiding.

Messrs. MAYO & WIDMER, for the plaintiff in error:

There is no common law liability of a village in respect to the repair of bridges. Dillon on Mun. Corp. (1st ed.) sec. 579, p. 551.

To charge it with the duty to repair, or make it liable for injuries for suffering a street to remain defective, there must be an acceptance of the dedication. Dillon on Mun. Corp. (1st ed.) sec. 505, p. 488; *Folsom* v. *Town of Underhill*, 36 Vt. 580.

A town must accept a road dedicated to them before they will be bound to keep it in repair, and are liable, if they do not, for injuries to individuals arising therefrom. *Hyde* v. *Town of Jamaica*, 27 Vt. 443.

In order to establish a dedication of land to the public for a way, proof of its acceptance as such by the public, acting through the proper authorities, is essential. (*Insurance Co.* v. *Littlefield*, 67 Ill. 369.) And so of a bridge. *Town of Rutland* v. *Town of Dayton*, 60 Ill. 67.

The same principle,—that the burden is one to be voluntarily assumed by the proper authorities,— is applicable to bridges, such as this, not constructed under the authority of the village. *City of Joliet* v. *Verley*, 35 Ill. 63; *City of Rockford* v. *Hildebrand*, 61 id. 158; *City of Alton* v. *Hope*, 68 id. 169.

The ninth instruction asked by the defendant ought to have been given. The question of acceptance, or not, is one of intention, to be inferred from the acts of the municipal authorities, and the facts established by the evidence; and such inference is one to be drawn by the jury, not by the court. *Folsom* v. *Town of Underhill*, 36 Vt. 580; *Town of Rutland* v.

*Town of Dayton*, 60 Ill. 58; *Town of Dayton* v. *Town of Rutland*, 84 id. 279.

Neither the fact that the bridge remained open to public travel, nor the appropriation of $800, nor both combined, constituted, *per se*, an acceptance of the bridge by the village, nor do they work a legal estoppel against it.    *Town of Rutland* v. *Town of Dayton*, 60 Ill. 58.

Messrs. BULL & STRAWN, for the defendant in error:

The village of Marseilles was, by law, entrusted with the care, custody and control of the streets and bridges within its corporate limits.    This doctrine has been so repeatedly held by the Supreme Court of this State, that it seems unnecessary to refer the court to authorities upon that question.    We will, however, refer the court to *Town of Mechanicsburg* v. *Meredith*, 54 Ill. 84; *Browning* v. *Springfield*, 17 id. 143; *Kreigh* v. *City of Chicago*, 86 id. 407; *Commissioners of Highways* v. *Board of Supervisors*, 111 id. 527.

That the corporate limits of the village of Marseilles extended to the center thread of the river, can not be questioned. Such has been the uniform doctrine in this, and, we might say, in all other States, in reference to all cities where a river forms the boundary line of the municipality.    However, to avoid any question upon this subject, we will refer the court to the following cases:    *Village of Brooklyn* v. *Smith*, 104 Ill. 429; *Ipswich, Petitioners*, 13 Pick. 431; *Iron Works* v. *Tolland*, 9 Cush. 492; *Piper* v. *Connelly*, 108 Ill. 646; *Braxon* v. *Bressler*, 64 id. 488; *Cobb* v. *Lavalle*, 89 id. 331; *Railroad Co.* v. *Stein*, 75 id. 42; *City of Chicago* v. *Laflin*, 49 id. 172; *Canal Trustees* v. *Haven*, 11 id. 554; *City of Chicago* v. *McGinn*, 51 id. 266; Dillon on Mun. Corp. sec. 94, note 2.

This doctrine has been established by numerous decisions of the Supreme Court of this State.    The same doctrine that applies to riparian proprietors applies to municipalities bounded upon a stream.    *Village of Brooklyn* v. *Smith*, 104 Ill. 429;

*State* v. *Cantabury,* 8 Fost. (N. H.) 195; *State* v. *Gilmonton,* 14 N. H. 467; *Iron Works* v. *Tolland,* 9 Cush. 492; *Palmer* v. *Hicks,* 6 Johns. 133. And see note 2 to sec. 124 of Dillon on Mun. Corp.

Like a sidewalk upon the streets, the village could not be compelled, in the first instance, to build it. If a private individual builds one, and it becomes of public utility, the village must either condemn it as a nuisance, and cause it to be removed, or, by permitting it to remain, they assume a liability for its reasonably safe condition. So with a bridge across a ravine that may be within the limits of a city or village. A bridge may be constructed upon a public street leading across such ravine, by a private individual, for his own personal benefit. Still, if it be used by the public, the city or village thereupon must see to it that it is safe. It is true they can condemn it as a nuisance; but if they permit it to remain, their liability attaches. Angell on Highways, (2d ed.) sec. 164; *Town of Mechanicsburg* v. *Meredith,* 54 Ill. 84; *Kreigh* v. *Chicago,* 86 id. 407.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was an action brought by George Howland, in the circuit court of La Salle county, against the village of Marseilles, to recover for an injury received on the 10th day of September, 1883, while crossing the Illinois river, which resulted from the falling of a part of the bridge into the river.

The village of Marseilles was incorporated in 1861, under a special charter, and is located in the town of Rutland. The Illinois river is the southern boundary of the village, and is also the boundary line between the towns of Rutland and Fall River, the latter lying south of the former. In 1865 a bridge was erected across the river at the point where Milwaukee street, (now Main street,) located in the village, intersects the river. The bridge was erected by the Marseilles Bridge Com-

pany, a corporation organized under a special law, enacted February 13, 1865. Section 3 of the act is as follows:

"Said company is hereby authorized and empowered to construct and maintain a bridge over and across the Illinois river, at or near Marseilles, in the county of La Salle, from the point where Milwaukee street, in the old town of Marseilles, intersects said river on the north bank, to that point on the south bank of said river (upon the west half of the south fraction of the north-east quarter of section 24, township 33 north, range 4, east of third principal meridian,) where the public highway intersects said river, or within forty rods thereof, east or west; and for the purpose of erecting and maintaining such bridge, and all the embankments, piers, toll-houses and dwelling houses for toll collection, and such other works as may be necessary for said bridge, the company may use so much of said Milwaukee street, and of said public highway, and of the bed and shores of said Illinois river, and of the materials, stone and earth thereon, as may be necessary."

The fourth section empowered the company to collect tolls. The fifth section required the company to keep the bridge in repair, and also required it to allow a speedy passage to all travelers, with their animals and vehicles.

At the January meeting, 1878, of the board of supervisors of La Salle county, $3500 was appropriated to aid the town of Rutland in purchasing the bridge. The town of Rutland appropriated $3200 for the same purpose. The village of Marseilles, on February 5, 1878, appropriated $800 to the commissioners of highways of the town of Rutland, for the same purpose. Money was also raised by private subscription, and on the 25th day of March, 1878, the bridge company sold and conveyed, for a consideration of $8836, to the towns of Rutland and Fall River, all its "right, title, interest and privileges, including its franchises, and the bridge and appurtenances, and approaches, across the Illinois river, at Marseilles, between the towns of Rutland and Fall River." From

the date of the purchase until after Howland was injured, the commissioners of highways of the town of Rutland made all the repairs on the bridge which were made, and assumed to have the charge and control, so far as was required to keep the bridge in proper repair for the use of the public. While that portion of the bridge which lay north of the middle of the Illinois river was within the corporate limits of the village of Marseilles, the village authorities took no steps in regard to the management or repair of the bridge prior to the injury received by Howland; and it is claimed that the village never accepted the bridge, and was under no legal obligation, at the time of the accident, to keep the bridge in repair.

At the time of the accident it is apparent that the bridge was unsafe and in a dangerous condition, and, so far as appears, the plaintiff was not guilty of negligence which contributed to the accident. The only question, therefore, to be determined is, whether that portion of the bridge which was within the corporate limits of the village was a part of the highway of the village, which it was bound to keep in repair.

The charter conferred upon the village the power to regulate, grade, pave and improve the streets and alleys in the town, and to levy taxes and borrow money to improve the streets. Under the powers conferred by the charter, it was the duty of the village to keep all the streets and highways in the corporation in a reasonably safe condition for the use of the public. No importance is to be attached to the fact that the commissioners of highways of the town of Rutland assumed to control and repair the bridge after the purchase from the bridge company. Commissioners of highways have no jurisdiction whatever over highways or bridges within an incorporated city, town or village located within their town. They can not levy a tax to build or repair bridges within an incorporated town, and they have no right to exercise any control or supervision over such bridges. *The People ex rel.* v. *Supervisors,* 111 Ill. 527, and the cases therein cited, are clear and conclusive upon

this question. Whatever, therefore, may have been done by the commissioners of highways of Rutland in repairing the bridge, was done without authority, and can have no bearing on the case.

The contract entered into between the bridge company and the town of Rutland on the 25th day of March, 1878, changed and converted the toll bridge, with its approaches and appurtenances, into a free bridge. Upon the execution of the contract all power and authority of the bridge company over the bridge and its approaches ceased, and the bridge became free to be used by the public as a public highway, in the same manner as all highways in the country are open for public use. When the bridge company parted with its franchises, and all power and control over the bridge, and contracted that it should be forever thereafter a free bridge, what duty then became imposed upon the village of Marseilles as to that part of the bridge within the corporate limits of the village? The question is an important one, and one, too, not entirely free from difficulty. Cities, incorporated towns and villages no doubt have the power, by proper action, to refuse to accept streets or highways which may be attempted to be established by dedication. This is a necessary power to prevent land owners from compelling such incorporations to assume the expenditure of large sums of money in making and improving streets or highways not necessary or demanded for public use. But that is not the question involved in this record.

In looking at the evidence, which it is proper to do, in order to determine whether the law was properly laid down in the instructions to the jury, it appears that Milwaukee street was one of the streets of the village extending to the river, before the village was incorporated under its special charter, in 1861. One witness testified, that after the village organized under its special charter, Milwaukee street was changed to Main street. "There was an old ford below where the bridge is. Prior to the time the bridge was built, there was travel by the public

down what is called Main street. They turned off a little to the west just before they got to the river." It also appears, from an examination of the evidence, that when the bridge company erected the bridge, there was a slough or bayou, extending from the river north of the bridge, to a point on the river south of the bridge. Doubtless this bayou or slough had caused the travel to turn off a little to the west. When the bridge was built, this slough or bayou was filled up in building the approaches to the bridge, thus bringing Main street, or Milwaukee street, as it was originally called, directly down to the bridge, as it was originally laid out on the plat of the village. Here was a public highway established and used by the public prior to 1861. The building of the bridge extended the highway from the bank to the center thread of the Illinois river. Now, a part of this highway, under an act of the legislature, was taken and devoted to a somewhat different use,— to a toll bridge. After being devoted to that use from 1865 to 1878, the bridge is purchased, and freed. The bridge and its approaches are thrown open to the public, and the public enter upon the use of it as a public highway. Under such circumstances, was any formal acceptance on the part of the village required, in order to hold it responsible for the safety of the highway? We think not. When the bridge company relinquished all rights acquired under its charter, all that part of the highway which it had controlled under the act incorporating it, passed back to the village of Marseilles, and became subject to its control. It occupied the same relative position to the village that it did before the bridge company was incorporated, and as Main street had been accepted by the village as a public highway years before, and used and treated as such, no new acceptance was required, as is the case where a street or highway is for the first time dedicated to the use of the public.

It may be said the bridge could not be forced on the village without its consent. We are willing to concede that the vil-

lage was not bound to maintain the bridge as a part of the public highway unless it saw proper to do so. It had the power to condemn the bridge as a nuisance, and close it up. It might, if thought advisable, vacate the street. But no action of this character was taken. The village took no action whatever manifesting an intention that the bridge should not be used as a public highway. On the other hand, it voluntarily appropriated $800 out of its own treasury to free the bridge, and make it a public highway free for all persons to travel over it; and after taking this action, the village then said nothing and did nothing, but now seeks to escape liability upon the ground that it did not accept the bridge; that it had no control over it; that the entire management and control rested upon the commissioners of highways of the town of Rutland. This position can not be sustained. The charter of the village conferred the power to control and repair its highways and streets, and a municipal corporation can not, as held in *Kreigh* v. *City of Chicago*, 86 Ill. 407, divest itself of a power which its charter confers. The law imposed upon the village the duty to keep its streets and bridges in reasonable repair, in order that the public might safely pass over them. That duty could not be shifted upon another. The fact that the bridge was not built by the village, does not relieve it of responsibility. An incorporated town is not bound to build a sidewalk upon a public street, but if one is constructed by an individual, and is used by the public with the knowledge of the town authorities, the law would require them to remove the walk or assume responsibility for its reasonably safe condition. The same may be said of a bridge constructed within the limits of an incorporated town. *Requa* v. *City of Rochester*, 45 N. Y. 129, is a case in point. It is there said: "But if a volunteer, instead of the city, had, seeing the need of it, put the bridge there, after it was placed there, and by the city allowed to remain for years, did it not adopt it and make it its own? Permitting it to remain as a usual and

·suitable means of overcoming a difficulty it had caused, did ·it not invite the citizen to use it? And did not the city thus ·come under the duty that he should use it with safety? In our _judgment it did." See, also, *Heacock* v. *Sherman*, 14 Wend. 48; *Manderschid* v. *City of Dubuque*, 29 Iowa, 73; Angell on Highways, sec. 257.

Objection has been made to the ruling of the court on the instructions, but what we have said obviates the necessity of :going over the instructions. The instructions, as a whole, are ·quite favorable to plaintiff in error. Indeed, if error was committed, the error was in favor of the defendant, and of this it ·can not complain.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*