Royce Dale Campbell, by Howard Campbell, His Father and Next Friend, Plaintiff-Appellee, v. City of Marseilles, Defendant-Appellant.

Gen. No. 10,805.

Second District.

February 17, 1955.

Released for publication March 8, 1955.

Joseph T. Guerrini, of Marseilles, and Zwanzig, Thompson & Lanuti, of Ottawa, for appellant.

Berry & O'Conor, of Ottawa, and George L. Herbolsheimer, of La Salle, for appellee.

. MR. JUSTICE DOVE delivered the opinion of the court.

Royce Dale Campbell, by his father, Howard Campbell, as his next friend, brought this suit against the City of Marseilles to recover damages for injuries which he incurred when he fell off the ledge of a newly constructed bridge located in the defendant city. The minor plaintiff was about six and one-half years old at the time he suffered the fall in question. Along with some other children, he was playing on the ledge of the Chicago street bridge, which extends over the Illinois-Michigan canal, and which bridge was located entirely within the boundaries of the defendant city and was a public bridge which had recently been constructed and accepted by the defendant city. The issues made by count two of the complaint and the answer thereto were submitted to a jury which returned a verdict in favor of the plaintiff for $5,000, and judgment was thereafter entered by the court upon this verdict. The complaint consisted of two counts. At the conclusion of plaintiff's evidence, the court directed a verdict as to count one and no complaint of that ruling has been made. Motions by the defendant for a directed verdict, for judgment notwithstanding the verdict and for a new trial as to count two were denied by the court, and the defendant appeals.

Count two alleged, in substance, that the plaintiff was born on the 29th of October 1945, and at the time of the occurrence thereinafter alleged, was six years of age; that on the 28th of August 1952, the day of the occurrence in question, and prior thereto, the defendant was a municipal corporation organized under the laws of the State of Illinois; that during all of said time the defendant owned, maintained, managed, controlled and held out to the public as being reasonably safe for pedestrians to travel certain public streets and bridges in its city and, in particular, Chi-

cago street bridge over and across the Illinois-Michigan canal; that over said canal the defendant caused and permitted the sides of the bridge spanning said canal to be and remain in a poor state of construction and repair and caused and permitted for a long time prior thereto certain large, unguarded and unenclosed holes and openings to remain and be in the sides of said bridge spanning said canal, and caused and permitted said holes and said openings in said sides of said bridge to be without any guardrails or other safety devices, although the defendant had prior knowledge that said guardrails or other safety devices were necessary to protect properly people going upon or about the bridge.

It was further alleged in the complaint that the defendant was using said bridge for the transportation of pedestrians and vehicles over it and over said canal, and that children were permitted to be around and about said bridge and, therefore, exposed to the dangers inherent in the unguarded and unenclosed openings in the side of the bridge; that said bridge was attractive, alluring and tempting to children of tender years and amounted to a strong inducement or invitation for them to play in and about the bridge; that, at the time of plaintiff's injuries, the defendant, disregarding its duties, wrongfully and negligently failed and neglected to place proper guardrails and safety rails over the large, unguarded and unenclosed openings remaining in the sides of said bridge and further failed and neglected to maintain an officer or other person around said bridge for the purpose of prohibiting children from playing about it and injuring themselves. The complaint then alleged that the plaintiff, while playing on said bridge, fell through one of the large, unguarded and unenclosed openings in the side of the bridge and suffered great bodily injuries as a result of such fall, the said injuries being

49

chiefly to his head, skull, brain and nervous system, for which he prayed damages.

■ ■ Counsel for defendant insists that this is an attractive nuisance count. The theory of counsel for plaintiff is that it is a common-law negligence count. The trial court so held and we agree. While this count does allege the bridge was attractive, alluring and tempting to children of tender years, and that children, in consequence of their childish impulses, would play in and about it, we do not believe it is a count based upon the bridge being an attractive nuisance. It was not an attractive nuisance, as it was a public bridge and no element of trespass is involved, which element of trespass is an essential ingredient of a count based upon the doctrine of an attractive nuisance. The essence of count two is it specifically charges that the defendant owned, maintained and controlled this bridge and held it out to the public as being safe for travel by persons and vehicles and that the defendant allowed and permitted said bridge to be and remain in a poor and unsafe state of maintenance and repair because of insufficient guard or safety rails, and because of leaving large holes in the railings on the sides of the bridge through which persons, and particularly children, might crawl while playing about the same, and that such conduct upon the part of the defendant amounted to negligence for which it was liable, and that its misconduct in failing to properly maintain the bridge proximately resulted in the plaintiff's injuries. This, as we view it, states a common-law cause of action predicated upon negligence.

According to the evidence, Chicago street bridge was a concrete structure of sufficient width to accommodate two automobiles passing over it at the same time in different directions. The bridge ran in a northerly and southerly direction over the Illinois-Michigan

50

canal, and the bridge floor was about twelve feet above the bed of the canal, which, at the time of the occurrence was dry. On each side of the bridge were railings which contained three openings eighteen inches high and fifty-eight inches in length. Outside of the railing was a ledge ten inches wide. The plaintiff, while playing on the bridge, climbed through one of these eighteen-inch by fifty-eight-inch holes in the railings and onto the ten-inch ledge, from which he fell. The bridge had been constructed and accepted by the city only some four or five months prior to the occurrence, and it was entirely within the city limits of the defendant city, and it was in the same condition on the day of the accident as it was when it was accepted by the city. The city officials had knowledge of the holes in the railings of the bridge. Grade school children passed back and forth upon the bridge in going to and from school, and the evidence showed they often stopped to play about and around the bridge. The bridge was located near Lincoln grade school, which was the school that served the neighborhood where the plaintiff lived, and the entire area within two and one-half blocks of the bridge was a residential area. Children testified that they often looked through and climbed through the holes in the railings on the bridge, and the plaintiff himself testified he had played in and about the bridge and its railings several times before the day on which he fell, although he had been warned by his parents not to do so and punished for not minding them. Plaintiff lived with his parents about a quarter of a block from the bridge. It was rather common, according to the evidence, for the neighborhood boys to play in and about the bridge in a manner similar to that in which the plaintiff was playing at the time he fell.

On the day of the occurrence, the plaintiff was playing about the bridge with two of his friends,

Richard Sharp and Richard Vangelisti, at about five o'clock in the afternoon. They were pulling up rocks from the dry bed of the canal with a rope. One of the boys would go down to the dry bed of the canal and fasten the rope to a rock, while the other one would remain at the top of the bridge and pull it up after it was fastened. When it came plaintiff's turn to pull up one of the rocks, he climbed through one of the holes of the railing and out onto the ten-inch ledge so he could pull up the rock a little easier. The rock which plaintiff was trying to pull up was rather heavy, and he become overbalanced and tumbled off the ledge to the dry bed of the canal some twelve feet below, and apparently landed on his head, and suffered the injuries for which he seeks damages in this suit. After the plaintiff fell, one of the neighborhood mothers, Mrs. Quercorgrossa, came and picked him up and took him to his mother. He was bleeding and unconscious. His mother took him to the hospital at once, where Dr. Johnson took charge of him and gave him such temporary treatment as he deemed the situation required. Plaintiff had a deep laceration on the right side of his head about three inches above his ear.

The testimony shows that plaintiff sustained the type of injury called "depressed skull fracture," compound in nature. The X-ray showed that the outer portion of the skull had been pushed inward, revealing a depressed fracture of the right parietal bone, which bone is located in the area roughly above the right ear and somewhat behind it. The fracture involved an area of about one and five-eighths inches. A segment of bone was broken off and driven into the cranial cavity to a depth of about one-quarter of an inch, which was of a sufficient depth that it would likely cause pressure on the brain itself. Dr. Johnson prescribed conservative treatment for the plaintiff, which consisted of putting him to bed for absolute quiet and

52

complete rest and the watching carefully for further developments and carefully checking on his blood pressure, respiration, pulse and neurological reactions.

Plaintiff made a fair recovery and commenced going to school after a few weeks, but he continued to complain of headaches and dizzy spells up to the time of the trial, and frequently had to stay at home because of such conditions. On occasions, he would have limping spells, when he would have to walk with a stiff leg and would go about for several days at a time dragging a leg. His hand, arm and leg often went to sleep, and he felt in them a numbness and would often have seizures of "pins and needles." Dr. Bailey, one of plaintiff's examining physicians and surgeons, and a specialist in radiology, was of the opinion that the headaches which plaintiff suffered were due to the fact that the fracture extended deep enough into the internal and external tables of the parietal bone to cause such headaches. Dr. Johnson, who was plaintiff's principal physician, testified the X-rays showed where a segment of the parietal bone was broken off and driven into the cranial cavity, and he gave it as his opinion that the fracture was depressed enough so that there would be pressure on the brain itself. X-rays taken about three or four weeks after the accident still showed, Dr. Johnson stated, a depressed segment of a fracture being driven into the cranial cavity. Dr. Murphy also examined the plaintiff about three weeks after his fall, and he gave it as his opinion that the type of depressed skull fracture incurred by plaintiff was a permanent condition unless something further was done about it.

■■■■ Complaint is made by defendant that there is much medical testimony in this record which is very speculative and conjectural and, therefore, highly prejudicial to the defendant, and resulted in an excessive verdict being returned by the jury. We have read the medical testimony carefully, and, while there

are a few instances in which it can be contended that the medical testimony borders on the speculative or conjectural side, we are of the opinion that there is nothing about this testimony so prejudicial in nature as to require a new trial. Some of the testimony complained about most strongly by the defendant was brought about by it through its own cross-examination, and, certainly, defendant is in no position to complain of this. The evidence clearly shows that the plaintiff received a serious injury to his head and skull; that up to the time of the trial he was still suffering from the effects of his fall, and that there was considerable likelihood that he had sustained some permanent injury to his head. From all the evidence we are unable to say that the verdict is excessive.

 Counsel for appellant further insists that this action is not maintainable against the defendant because it is a municipality and acting in a governmental capacity in the construction and operation of this bridge and not in a proprietary capacity. That a municipal corporation holds its streets, highways and bridges in a proprietary or corporate capacity as distinguished from a governmental capacity, and that it is required to keep them in a state of repair and maintenance so that they will be reasonably safe for public use, is settled law of this State. (Linneen v. City of Chicago, 310 Ill. App. 274; The Village of Marseilles v. Howland, 124 Ill. 547; Hanrahan v. City of Chicago, 289 Ill. 400.) The defendant seeks to get away from the above rule by asserting that if there is any negligence involved in this case, it was in connection with the plan of construction of the bridge, which was done by a third party and not by the defendant, the defendant merely taking over the bridge after it had been constructed by someone else and the defendant was thus not liable for the third party's neglect. There is no merit in this contention. In Linneen v. City of

54

Chicago, 310 Ill. App. 274, the court stated: "It seems to us, however, that the liability of the city does not depend upon who owned the property bordering on the highway, nor who constructed the bridge, since the approaches and the bridge were part of the public highway which the city for years before this accident had invited the public to use. It is the duty of a municipality to exercise ordinary care to keep the public highway reasonably safe, including that part of the highway, if any, which has been constructed by a third party, provided that by invitation and consent of the city it is used for public travel. (O'Connell v. Chicago & N. W. R. Co., 305 Ill. App. 430; Hogan v. City of Chicago, 168 Ill. 551, 558, 559, and cases cited therein; Town of Normal. v. Bright, 223 Ill. 99.)" If the rule contended for by appellant was the law, defendant might have accepted this bridge with large holes in its floor through which persons and vehicles might fall and then seek to avoid liability on the ground that a third party constructed the bridge. Since the defendant had previously accepted the bridge where plaintiff's injuries occurred, the law fixed upon it the responsibility of exercising ordinary care for keeping and maintaining it in a reasonably safe and proper condition for public use. (City of Rock Island v. Starkey, 189 Ill. 515; Brown v. City of Streator, 324 Ill. App. 659.) The defendant city was charged with notice of the unguarded and unenclosed holes in the railings on the sides of the bridge in question, and its failure to do something about such holes in order to make this bridge reasonably safe for public use, together with the other evidence introduced as to the condition of this bridge and the surrounding area, was sufficient to present a question for the jury with regard to whether or not the city was guilty of negligence in its operation and maintenance of the bridge in the condition in which it accepted it. The jury found that the city was negligent in permitting the bridge to be

and remain in the condition in which it accepted it, and we think there is sufficient evidence in the record to sustain the verdict and judgment.

■ ■ It is finally insisted by counsel for defendant that the court erred in not declaring a mistrial because the question of the city being insured against the liability here sought to be invoked was injected into the case during the trial and thus prejudiced the position of the defendant before the jury. The record shows that when Dr. Johnson was being questioned by the defendant, there was exhibited to him a certain medical report about which counsel for the plaintiff states he knew nothing prior to the time that it was exhibited at the trial. The defendant's counsel was seeking to impeach Dr. Johnson with this report, although the report was not introduced in evidence. After defense counsel finished his cross-examination of Dr. Johnson, counsel for plaintiff went over to the defense table and asked for the "insurance report." Counsel insists that he did this inadvertently and had intended to ask for the "service report," which was the name that was written on the report, but he asked for this "insurance report," according to the record, in a very low tone of voice. His back was to the jury and he was about fifteen feet from the jury at the time he asked for the report in question. The court reporter stated he heard counsel mention the "insurance report," and the court reporter was about the same distance from counsel as was the jury. The court did not hear the word "insurance" mentioned, but did hear something mentioned about a report. Counsel for defendant moved that a juror be withdrawn and a mistrial declared. The court denied this motion, stating that he was of the opinion the jury had not heard counsel's inadvertent remark. The general rule is, of course, that a plaintiff cannot show, as an independent fact, or otherwise, that the defend-

ant has insurance which will protect him against the liability sought to be imposed. (Piper v. Epstein, 326 Ill. App. 400, 405, and cases cited.) In the case at bar, as we read the record and understand what transpired, we are of the opinion the court was well within its discretionary powers in denying defendant's motion to withdraw a juror and declare a mistrial. The court was present and saw and heard what transpired, and he stated he did not hear the word "insurance" mentioned and gave it as his opinion that the jury did not hear it. It was within his discretion, under all the attendant circumstances, to deny the motion for a mistrial, and we cannot say, upon the basis of this record, that he abused the discretion vested in him.

We have examined this record with care and have considered the alleged errors, and have reached the conclusion that the verdict of the jury is amply sustained by competent evidence and that there is no error in the record which would justify a reversal. Accordingly, the judgment is affirmed.

Judgment affirmed.

WOLFE, P. J. and CROW, J., concur.