Charles J. Locigno, Administrator of the Estates of Mary Locigno, Deceased, and Dominick Locigno, Deceased; Lucille Locigno; and Charles J. Locigno, Plaintiffs-Appellees, v. City of Chicago, a Municipal Corporation, and Ollie Barker, Defendants. On Appeal of the City of Chicago, a Municipal Corporation.

Gen. No. 48,303.

First District, Second Division.

October 24, 1961.

John C. Melaniphy, Corporation Counsel of the City of Chicago (Sydney R. Drebin and Harry H. Pollack, Assistant Corporation Counsel, of counsel), for appellant.

Joseph Barbera, of Chicago (Charles D. Snewind, of counsel), for appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

A complaint was filed by Charles J. Locigno in his own behalf for personal injuries and property damage, and as administrator of the Estates of Mary Locigno and Dominick Locigno, his deceased children, for their wrongful deaths, and by Lucille Locigno, his wife and the mother of the children, for personal injuries, as the result of a collision between an automobile operated

by Ollie Barker and an automobile owned and operated by Charles Locigno in which the children and their mother were riding, at the intersection of Gladys and Kostner Avenues in Chicago, against Ollie Barker, the City of Chicago and the owners and lessors of a tavern joined under the Dram Shop Act. The dram shop defendants paid Charles and Lucille Locigno $6,000 under a covenant not to sue and the action was dismissed as to them. The jury returned a verdict finding the City and Barker guilty, assessing damages to the administrator in the sum of $20,000 for each death; $15,000 to Lucille Locigno and $8,500 to Charles Locigno. Judgments were entered on the verdict. The judgments in favor of Charles and Lucille Locigno were reduced by the amount of $3,000 each by reason of the payments under the covenant not to sue. Motions by the City for a directed verdict, judgment notwithstanding the verdict and a new trial were denied and it appealed.

The unfortunate mishap occurred at about 6:00 p. m. on Saturday, June 19, 1954, at the intersection of Gladys and Kostner Avenues in Chicago. Gladys Avenue runs east and west. It is located one block south of and runs parallel with Jackson Boulevard, a through street and a preferential highway within the jurisdiction of the Chicago Park District. Gladys Avenue is intersected by Kostner Avenue, a north and south street and these streets are under the jurisdiction of the City. Jackson Boulevard had been a preferential street and a boulevard under the jurisdiction of the Park District since 1913, and for many years prior to the occurrence 4-way red and green stop and go lights were operated at the intersection of Jackson Boulevard and Kostner Avenue. These lights regulated the movement of traffic on Jackson Boulevard and across Jackson Boulevard at Kostner Avenue. Two or three months prior to the occurrence the Park District was given per-

414

mission by the City to detour traffic on Jackson Boulevard and reroute the vehicles over Gladys Avenue. On June 16, 1954, the City placed "No Parking" signs along Gladys Avenue from Kolmar to Hamlin Avenues because the repaving of Jackson Boulevard was scheduled to begin on the following day. On Thursday, June 17, 1954, barricades were placed across Jackson Boulevard at Hamlin and Kolmar Avenues and detour signs directed traffic to Gladys Avenue, which was made a detour for Jackson Boulevard traffic. The part of Jackson Boulevard thus blocked off was about one mile, Kolmar Avenue being on the west end and Hamlin Avenue on the east end.

On Thursday, June 17, 1954, the Park District started to repave Jackson Boulevard from Kolmar Avenue east to Hamlin Avenue. The traffic going east on Jackson Boulevard was detoured north and south of Jackson Boulevard at Kolmar Avenue. On Saturday, June 19, 1954, Charles Locigno, driving a 1952 Ford sedan in which were his wife and two children, was going east on Jackson Boulevard. He detoured south on Kolmar Avenue to Gladys Avenue and proceeded east on Gladys Avenue at about 15 miles an hour in the lane south of the center of Gladys Avenue. When he arrived at the intersection of Gladys and Kostner Avenues he slowed down to about 8 miles an hour. He looked to the north and saw no automobiles coming. He looked to the south and saw Barker's automobile about 100 feet away coming north on Kostner Avenue. Locigno then drove into the intersection looking straight ahead. When the front of Locigno's automobile was about up to the east curb of Kostner Avenue he saw Barker's automobile out of the corner of his eye. At that time Barker's automobile was about 10 feet away. Locigno's automobile was hit in the back by the front of Barker's automobile. As a result of the

collision, both Locigno children were killed, Locigno and his wife were injured and his automobile was damaged.

Locigno testified that there were "No Parking" signs posted along Gladys Avenue; that as he approached the intersection of Gladys and Kostner Avenues he saw no signs or vehicles; that there were no automobiles parked on Kostner Avenue near the southeast corner; that when he first saw Barker's automobile he could not determine its speed; that when he again saw that automobile it was 10 feet away and was going between 50 and 60 miles an hour; that as he, Locigno, was going east on Gladys Avenue there were no automobiles going east in front of him and none going west approaching him; that when he reached the intersection of Gladys and Kostner Avenues there were no automobiles going south on Kostner Avenue; and that Barker's automobile was the only one going north on Kostner Avenue. Locigno also testified that after the collision he observed that Barker's eyes were flashy; that Barker staggered; and that he suspected that Barker was drunk. Locigno admitted that in a deposition he testified that Barker was drunk. Locigno testified further that he knew that Gladys Avenue was not a through street and that when he reached the intersection of Gladys and Kostner Avenues he had an unobstructed view of Kostner Avenue south of Gladys Avenue. Mrs. Locigno did not know how the collision happened because at the time she was in the back seat of the automobile talking with her daughter.

Barker's deposition, taken by plaintiff at Stateville Penitentiary, was read into evidence. He testified that at the time he was driving a 1950 Buick automobile; that in the automobile with him were a man named Danny and a woman whose name he did not know. He told about visiting taverns and drinking during a two-day period. He testified that after leaving a tavern

416

he drove north on Kostner Avenue; that the distance from the place where he started to the place of the collision was about 6 blocks; that on the way he stopped at a stop light at Roosevelt Road; that he did not know the neighborhood and drove according to the way the man riding with him told him; that as he approached the intersection of Gladys and Kostner Avenues he was going about 30 to 35 miles an hour; that he saw no signs at that intersection for traffic northbound on Kostner Avenue; that he was going less than 30 miles an hour when he entered the intersection; that when he first saw Locigno's automobile it was directly in front of him, about an automobile length away and in his lane; that the front of his automobile collided with the right side of Locigno's automobile; that he had barely hit his brake and was going about 25 miles an hour; that at the time it was daylight and the pavement was dry; and that at the time of the collision he thought Locigno was going 10 or 15 miles an hour. Two policemen testified about Drunkometer tests given to Barker which indicated that he was under the influence of alcoholic liquor. A city policeman testified that he and his partner who were assigned to the Accident Unit investigated the collision; that Kostner Avenue is about 40 feet wide from curb to curb and Gladys Avenue 30 feet wide from curb to curb; that at the southeast corner of the intersection, facing traffic northbound on Kostner Avenue, was a sign marked "Slow." A photograph of the intersection shows 2 signs on a light post on the southeast corner. The top sign shows "Slow Children Crossing" and the bottom one shows "Detour Straight Ahead." The "Slow Children Crossing" sign was for traffic northbound on Kostner Avenue and the "Detour Straight Ahead" sign was for traffic eastbound on Gladys Avenue. This policeman also testified that on the day in question neither Kostner Avenue nor Gladys Avenue was a through street

and that the speed limit was 30 miles per hour. Another policeman testified that after the collision he took a statement from Barker who was then under the influence of intoxicating liquor, and that he placed charges of reckless homicide, vehicle right of way and driving too fast for conditions against Barker and that Barker pleaded guilty to the charges.

Plaintiffs called Martin Connelly as a witness under Sec 60 of the Civil Practice Act. He testified that he is a traffic engineer for the City; that he is in charge of keeping traffic moving on the streets where construction work is in progress; that this involved the placing of necessary signs; and that he decides what signs are necessary and makes the arrangements with the City's Traffic Sign Shop to place the signs. Over the objection of the City he testified that on Friday, June 18, 1954, he ordered over the telephone that stop signs be placed on Gladys Avenue from Kolmar to Hamlin Avenues. The order was given to Robert Sutherland of the City's Traffic Sign Shop. At the same time Connelly ordered 4-way stop signs at Gladys and Kostner Avenues. He also testified that on June 18 he toured the area and found that the streets intersecting Gladys Avenue were open north of Gladys Avenue to Jackson Boulevard; that local deliveries were being made on these streets; that the local delivery traffic had to come back south on these streets; that if the local delivery traffic had to come to a complete stop at Gladys Avenue it would facilitate the traffic and make it safer; and that after the detour was set up, Gladys Avenue was used as a detour but not as a boulevard. Connelly further testified that the stop signs were not put up on Sunday, June 20, because the men do not work on Sunday; that the men do not work on Saturday either unless ordered to do so; and that he does not have the authority to order the men to work on Saturday or

418

Sunday. Connelly testified about a written report of the City's sign hangers showing that stop signs along Gladys Avenue from Kolmar to Springfield Avenues were put up on June 21, 1954. Two reports show installation of stop signs along Gladys Avenue to Pulaski Road and a stop sign on each corner of the intersection of Gladys and Kostner Avenues. Connelly also testified that on June 16, 1954, the City placed "No Parking" signs along Gladys Avenue from Kolmar to Hamlin Avenues because the work making the detour necessary was to start the following day; that the City did nothing more on June 18, 19 and 20, except that he toured the area; that his tour was around 10 or 11 a. m. on June 18; that he gave the order for the stop signs about 2:30 p. m., June 18, when he returned to his office; that he had no authority to make Gladys Avenue a through street; and that the stop signs he ordered were to be put up on June 21, which was the next working day.

Herbert G. Fencl, a traffic engineer for the City, testified that he was in charge of the detour; that the detouring of traffic over Kolmar and Gladys Avenues did not make them boulevards; that he visited the detour area when it was in operation; that the traffic there varied during the day; that it was not exceedingly heavy when he was there; that the detour was capable of carrying the traffic; and that the detour produced no hazard. Robert Sutherland, a truck dispatcher in the City's Traffic Sign Shop, testified that in June, 1954, the sign hangers did not work Saturdays or Sundays; that the Traffic Sign Shop had no emergency vehicles to erect signs immediately when ordered; that detour sign orders were usually given over the telephone; that when an order for signs was received he would select the signs the night before; and that the next morning the sign hanging trucks would pick up the signs for hanging. He said further that

men in his department are available to work Saturday or Sunday if authorized to do so, that "every order is a rush order and our department tries to fill it as soon as possible." Francis J. Ryan, employed as a sign hanger and who put up the signs at Gladys and Kostner Avenues, testified that many times he was told to put up a sign in a hurry; that "I have worked Saturdays, Sundays and on emergencies. If I was told to put up a sign on the 18th or 19th, I would have done so."

██ A through street can be established only by the City Council. Ch 27–51, Municipal Code. Ch 27–52 of that code provides that whenever an ordinance designates a through street it shall be the duty of the commissioner of streets and electricity to place and maintain a stop sign on each and every street intersecting such street, unless the traffic at the intersection is controlled by traffic-control signals. The City Council did not designate Gladys Avenue as a through street. It was not a through street in 1954. Even if the City Council had designated it as a through street, it would not have been one until the proper signs were posted. No stop signs were posted at the intersection of Gladys and Kostner Avenues. See Dina v. Passaglia, 302 Ill App 159, 165, 23 NE2d 773. Charles Locigno, who drove the automobile in which plaintiffs and their children were riding, testified that he knew that Gladys Avenue was not a through street. Martin Connelly, traffic engineer for the City, had no authority to decide for the City that Gladys Avenue should be a through street. Gladys Avenue was used as a detour street and was not made a through street by the City. Plaintiffs say in their brief that the basis of their theory is "not that Gladys Avenue was in 'fact' a through street but that it was permitted to be used as a through street," and that the facts in evidence establish the liability of the City. A street does not become a

through street because it is used as a through street. It becomes a through street because it is so designated and appropriate signs placed. The City Council did not authorize any of its officers or employees to represent to the traveling public that Gladys Avenue was a through street.

■■■■ Should the case be considered from the standpoint of regulation of traffic, the City would not be liable. As a general rule, public liability for an injury resulting from the use of a street or other public way in such mode or manner as to endanger the safety of travelers, but which does not render the way physically defective, cannot be predicated upon the failure of the public authorities, by the enactment and enforcement of ordinances or otherwise, to prevent such use. 25 Am Jur Highways, Sec 359, p 652. See 92 ALR 1496. McQuillin, Mun Corp (3rd Ed) Vol 18, Exercise of Police Power, par 53.35, p 231, states: "The regulation of traffic is a governmental function, and a city may not be held liable for acts or omissions with respect thereto." In James v. City of Waterbury, 12 A2d 770, 771, 126 Conn 525, it was held that the city was not liable for injuries to a pedestrian struck by an automobile while in a crosswalk at an intersection where the automatic traffic signal at the intersection was out of repair. The City had kept a steady light burning in the traffic signal. The court pointed out that during the disrepair of the traffic light, the City had the choice of eliminating all lights or installing a steady one. Johnston v. City of East Moline, 405 Ill 460, 91 NE2d 401, and City of Chicago v. Seben, 165 Ill 371, 46 NE 244, indicate that until the City acts it cannot be held liable. In the case at bar the City was under no obligation to post signs at the intersection. The Johnston case involved traffic-control lights that were in operation at the time of the accident.

Furthermore, the proximate cause of the collision and the injuries and death of the occupants of the Locigno car was the reckless driving of Ollie Barker, who was intoxicated. See Storen v. City of Chicago, 373 Ill 530, 27 NE2d 53; Briske v. Village of Burnham, 379 Ill 193, 39 NE2d 976; Adamczyk v. Zambelli, 25 Ill App2d 121, 166 NE2d 635. It is unnecessary to consider other points urged by the City. For the reasons stated the judgment is reversed and the cause is remanded with directions to enter judgment for the City and against plaintiffs.

Judgment reversed and cause remanded with directions.

FRIEND, P. J. and BRYANT, J., concur.