ORA B. HARDING, Individually and as Adm'r of the Estate of James Harding, Deceased, Plaintiff-Appellee, *v.* CHICAGO PARK DISTRICT *et al.*, Defendants-Appellants.

(No. 60669;

First District (3rd Division)—November 20, 1975.

Tucker, Watson, Butler & Todd, of Chicago (Robert L. Tucker and John H. Watson, of counsel), for appellants.

Daniel E. Talan, of Chicago, for appellee.

Mr. PRESIDING JUSTICE McGLOON delivered the opinion of the court:

This is an action for wrongful death brought by Ora Harding, administrator of the estate of the deceased, James Harding, who sustained injuries resulting in his death when struck by a vehicle allegedly participating in a drag race. The suit was brought against the Chicago Park District, a municipal corporation which maintained and controlled the strip of roadway where the incident occurred, and Albert Macon, the driver of the vehicle which struck the deceased. At the close of all the evidence, defendant Chicago Park District moved for a directed verdict and the trial court ordered that said motion be denied. The cause then went to a jury which returned a verdict of $77,000 against both defendants. After the trial court entered judgment on that verdict, defendant Chicago Park District filed post-trial motions asking for judgment notwithstanding the verdict and for a new trial. The trial court ordered that both motions be denied and defendant Chicago Park District now appeals. The individual defendant, Albert Macon, takes no appeal from the verdict and judgment entered against him.

Defendant Chicago Park District contends on review that the trial court erred in denying defendant's motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial because (1) there is no evidence of any negligence on defendant's part, (2) there is no evidence that the decedent was in exercise of due care for his own safety, and (3) the trial court committed reversible error in receiving into evidence certain post-accident photographs of the roadway in question. Defendant Chicago Park District further contends on review that the trial court committed reversible error in instructing the jury on the law applicable to the case.

We reverse.

The incident in question occurred on the southernmost portion of a stretch of roadway running in a straight north to south direction along

the lake shore between 31st and 46th Streets on the south side of Chicago. This stretch of roadway, known as Inner Lake Shore Drive and formerly a part of the old Outer Drive, is maintained and controlled by defendant Chicago Park District and is used as a parking area to accommodate people using a public park adjacent to the roadway.

As early as 1964, the Chicago Park District was aware that this particular roadway was being used for drag racing and on various occasions prior to the incident in question installed barriers on the roadway as a means of curtailing this drag racing. In 1964 there were in existence six steel barriers extending across the center of the roadway in an east to west direction leaving enough room at either end so cars proceeding both north and south on the roadway could pass. Three of the barriers were constructed on the northern half of the roadway and the other three were constructed on the southern half. In 1964 or 1965 vandals using acetylene torches cut off certain of these steel barriers at the ground level and moved them off to the side of the roadway. The Chicago Park District then changed the structure and design of the barricades, replacing them with small triangular cement abutments twelve to sixteen inches high. However, the racing continued even after the concrete abutments were installed.

In May of 1968, after a meeting with the Chicago Police Department, the Park District installed an additional three barricades in the roadway in question. In August of the same year, again at the request of the Chicago Police Department, the Park District installed numerous additional barricades, thus leaving barricades at intervals of four hundred feet. At this time the Park District also installed signs prohibiting drag racing. In October of 1969, the Chicago Police Department again urged that additional barricades be installed between the already existing barricades. The Park District complied and the distance between the barricades was thus reduced to approximately two hundred feet. The distance between the last barricade and the southern terminal of the roadway, the area where the incident occurred, was between two hundred and two hundred and fifty feet.

On May 19, 1970, the day of the incident, the decedent and his family set out to have a picnic lunch at the public park area adjacent to the above roadway. Accompanied by his wife and four children, the decedent drove the family automobile to the general location of 4600 Inner Lake Shore Drive and parked the automobile between the southernmost barrier and the southern terminal of the roadway.

During that afternoon, the decedent and his family enjoyed a picnic lunch and other leisure activities at the park. Later in the day, at approximately 6 or 6:30 P.M., the decedent and his wife were standing

next to their automobile and engaged in conversation with other persons in the park. At this particular moment and without notice or warning the decedent was struck by a vehicle driven by Albert Macon. Although Macon denied that he had been drag racing and sought to blame an unknown drag racer, who, according to Macon, caused him to lose control of his car, Macon was arrested and later pleaded guilty to involuntary manslaughter for his role in causing the injuries which resulted in Mr. Harding's death.

Approximately two years after the above occurrence, the Chicago Park District initiated a beautification program which included most of the park area adjacent to the above roadway. As part of the beautification program, the Park District removed the above roadway in its entirety and replaced it with cul de sac type parking areas. With these new parking areas in existence, the drag racing ceased entirely. Over the objection of defendant, photographs of these new parking areas were received into evidence by the trial court.

Along with its verdict of $77,000, the jury returned answers to special interrogatories concerning the decedent's exercise of due care and defendant Chicago Park District's negligence. Consistent with its general verdict, the jury found that the decedent did not fail to exercise due care for his own safety and that the Chicago Park District was negligent and that this negligence was the proximate cause of decedent's injuries.

■■ Both plaintiff and defendant agree that in the instant case the duty of defendant municipal corporation is, as stated in section 3—102 of the Local Government and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 3—102), "* * * to exercise ordinary care to maintain its property in a reasonably safe condition * * *." It is well established that local public entities will be liable for injuries arising out of their failure to maintain their property in that condition. (*Hennigs v. Centreville Township* (1974), 56 Ill.2d 151, 306 N.E.2d 287.) A municipal corporation is liable for its failure to keep its streets in a state of repair and maintenance so that they are reasonably safe for public use. *Campbell v. City of Marseilles* (1955), 5 Ill.App.2d 45, 124 N.E.2d 677; *Cogdill v. City of Marion* (1959), 22 Ill.App.2d 99, 159 N.E.2d 28.

As indicated by the above statute and cases, defendant's duty in the instant case is that of maintenance. As stated in *Illinois Central R.R. Co. v. Illinois Commerce Com.* (1947), 397 Ill. 387, 392, 74 N.E.2d 526, 528:

> "The word 'maintain' has a well-understood meaning, *viz.*, 'to hold or keep in any particular state or condition, especially in a state of efficiency or validity; to support, sustain, or uphold; to keep up; not to suffer to fail or decline.'"

As indicated by the above definition, maintenance involves preserving the roadway, keeping it up, not permitting it to fall into a state of disrepair. Maintenance would involve, for example, the filling of pot holes, the repairing of deteriorated portions of the roadway, etc. There is no evidence in the record that defendant Park District did not maintain the roadway.

██ Furthermore, as stated in *American State Bank v. Cude* (1975), 30 Ill.App.3d 206, 207, 331 N.E.2d 825, 826:

> "[A]lthough a city is liable when a course of public improvements creates an unreasonably dangerous condition (*City of Chicago v. Seben*, 165 Ill. 371, 46 N.E. 244; *City of Beardstown v. Smith*, 150 Ill. 169, 37 N.E. 211; *Village of Marseilles v. Howland*, 124 Ill. 547, 16 N.E. 883), municipalities have not been held liable for failing to undertake public improvements."

Similarly, public liability for an injury resulting from the dangerous use of a street, but which does not render the street physically defective cannot be predicated on the failure of public authorities to prevent such use. (See *Locigno v. City of Chicago* (1961), 32 Ill.App.2d 412, 178 N.E.2d 124.) In the instant case there is no evidence that defendant Park District created an unreasonably dangerous condition nor that the roadway was physically defective.

It is clear that defendant Park District had notice of the drag racing and had constructed barriers for the purpose of curtailing said drag racing. It is further clear that at least in the area between the southernmost barrier and the southern terminal of the roadway the drag racing did not stop and that as a result of this continued drag racing decedent sustained injuries which resulted in his death. Given the above facts, plaintiff relies on *Baran v. City of Chicago Heights* (1969), 43 Ill.2d 177, 251 N.E.2d 227, for the proposition that where a public entity undertakes to provide an improvement, it is liable for injuries resulting from deficient or inadequate ones. In *Baran* plaintiff was injured when his car went past a dead end street and crashed into a tree. Defendant municipality had installed lights at that particular location and as plaintiff's car entered the area his headlights came into contact with the overhead lights installed by the city. The lights blended to cause a glare at which point the front wheels of plaintiff's auto went off the side of the road causing plaintiff to crash into a tree. Explaining its decision for plaintiff, the court in *Baran* stated:

> "The court has long recognized that where a city undertakes to provide lights, it is liable for injuries which result from deficient or inadequate ones. (*Johnston v. City of East Moline*, 405 Ill. 460; *City of Chicago v. Powers*, 42 Ill. 169; *City of Freeport v. Isbell*,

83 Ill. 440.) In holding a city responsible for injuries thus caused the court is not reviewing the city's discretion in selecting a plan. It is not controlling or passing upon the city's estimate of public needs. Nor is it deciding what the 'best' kind of improvement may be. It is simply saying that when a city creates a hazardous condition and someone is injured as a consequence it must respond in damages, just as others are required to do." (*Baran v. City of Chicago Heights*, 43 Ill.2d 177, 180-81, 251 N.E.2d 227, 229.) In the instant case defendant did not create a hazardous condition. In fact, when defendant became aware of the hazardous condition created by others on the roadway it controlled, defendant on five different occasions took steps to curtail said condition.

■■ It is our decision on appeal that there is no evidence of any negligence on the part of defendant Chicago Park District and that the jury's answer to the special interrogatory concerning said defendant's negligence must be set aside. Under the standard in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 229 N.E.2d 504, the trial court erred in not granting defendant's motions for a directed verdict and for judgment notwithstanding the verdict and therefore, the judgment of the trial court must be reversed. Having thus ruled, we see no reason for considering defendant's remaining contentions.

Judgment reversed.

McNAMARA and MEJDA, JJ., concur.