Albert S. Villegas, Jr., a Minor, by Josephine Villegas, His Mother and Next Friend, Plaintiff-Appellant, v. Emerson K. Kercher, Administrator of Estate of Edward H. Kercher, Deceased, and Electrolux Corporation, Defendants-Appellees.

**Gen. No. 10,944.**

Second District.

August 22, 1956.

Released for publication September 25, 1956.

283

Kramer & Kramer, of Elgin, for appellant; Robert B. Kramer, of Elgin, of counsel.

Charles G. Seidel, of Elgin, for appellee Emerson Kercher; George D. Carbary, of Elgin, for appellee Electrolux Corporation.

JUSTICE EOVALDI delivered the opinion of the court.

This action was brought to recover damages suffered by the plaintiff occasioned by the alleged negligence of defendant administrator's decedent in driving his automobile while acting as a salesman and agent of the defendant, Electrolux Corporation. At the close of all the evidence, the court granted the motion of both defendants for directed verdicts, instructed the jury to find both defendants not guilty, upon which instructions the jury rendered a verdict for the defendants. The court entered a judgment on the verdict, and later denied plaintiff's motions for a judgment notwithstanding the directed verdict, and for a new trial, from which this appeal is taken. To the plaintiff's allegations of negligence, the administrator filed a general denial of negligence and injury; and for a further plea in defense of the case, said that at and immediately prior to the occurrence in question, the said Edward H. Kercher, now deceased, had departed this life and was dead. The corporation filed a general denial of negligence and injury, admitted deceased's agency during his lifetime, neither admitted nor denied deceased was in the scope of his employment at the time of the occurrence; and for a further defense, said that at or immediately prior to the occurrence in question said Edward H. Kercher had departed this life and was dead, and that the cause of his death was a cerebral hemorrhage, or that immediately prior to the occurrence in question, life was leaving the body of the decedent, that he was unconscious and died immediately thereafter. Plain-

tiff's replies denied both defendants' affirmative defenses.

The plaintiff's theory is that as a matter of law the decedent was guilty of negligence as charged, that he was a salesman and agent of the corporation and acting within the scope of his employment at the time of the occurrence, that the defendants failed to meet their burden of proof of their affirmative act of God defense by a preponderance of the evidence, or by any evidence, and that the trial judge should have granted the plaintiff a judgment notwithstanding the directed verdict; or, in the alternative, the trial judge should have denied defendants' motions for directed verdicts and allowed the decision to go to the jury.

The appellees contend that the trial court should have instructed the jury, as he did, to find the defendants not guilty, since all reasonable minds would conclude from the evidence that the plaintiff had not proven his case.

Plaintiff, Albert S. Villegas, Jr., was a five-year-old school boy on October 1, 1953 when the injuries in question were suffered. Edward H. Kercher was an agent and salesman for the corporation. Electrolux furnished their salesmen with a kit and vacuum cleaner and sent them out after sales-meetings to sell house to house or by contact. Salesmen sold any time of the day or evening, usually in the customer's home, and in any area. When a sale was made, a contract was signed by the salesman and the buyer, and the sale was consummated. The salesman received a commission and the corporation made a profit.

Edward Kercher made an appointment with Mrs. Martin Skok, Jr. for the evening of October 1, 1953 and came with his cleaner, giving a demonstration from about 7:30 p.m. to 8:30 p.m. or 8:45 p.m. at the Skok home. A contract was signed and Mrs. Skok made a purchase about 8:30 p.m. A cleaner was left with her. On October 11, 1953 she paid for the machine by check

285

to George Schini, who was the manager of the Wauke-gan branch where Kercher was employed. Kercher lived at Cedar and Cooper Avenues in Elgin, east of the Fox River, in the northeast corner of Elgin. Mrs. Skok lived at McClure and Lawrence, four blocks west of the river and Kimball Street Bridge. North Grove Avenue is the first block east of the river and Cherry Street is the third block north of Kimball Street. The contract between Mrs. Skok and Edward Kercher was ratified by the corporation, a commission was paid on the sale, and a profit was made by Electrolux.

Edward Kercher left the Skok home between 8:30 p.m. and 8:45 p.m. in his auto, a Buick four door sedan. George Harvey, sometime about 8:30 p.m., saw Kercher's car approach North Grove on Cherry Street from the east. The car was estimated as going twenty to twenty-five miles per hour. The car ran the stop sign, turned right (north) with its parking lights on, its right turn signal blinking, and with its tires squealing. It did not slacken its speed or weave. At the second house from the corner, after running on the west side of North Grove, the car went over a six to seven inch curb, bumping a utility pole and continued directly over the narrow Villegas front yard between the side-walk and trees and the house. It struck the plaintiff who was in the yard or on the walk, knocked the Vil-legas car in the street, and finally came to a stop against the Atlas Boiler Company brick wall. Plaintiff was knocked into semi-consciousness and deep shock and suffered a compound comminuted fracture of the left femur. At the time of the trial, it was the opinion of his doctors that he had a permanent ten per cent loss of flexion and use of the left leg due to his injury.

Cherry Street is downhill as it approaches Grove from the east. There were no cars parked on Grove. It was fairly dark, there was no precipitation. The roads were dry, concrete surfaced and average width. The car was estimated to have gone about 225 feet from

the corner of Cherry north to the point where it was stopped by the Atlas Boiler building brick wall. It was about a 90 degree turn from Cherry Street onto Grove Avenue.

Harvey testified further that he saw Albert Villegas, Sr. (since deceased), holding plaintiff and that he then went over to the Kercher car which was up against the wall of Atlas Boiler. "The window on the left hand was open but first I noticed when I walked up there, the right blinker was still working. Then I walked to the side of the car and the window was open and the man was slumped over the steering wheel with his head bent forward." He testified that a hat was in the middle of the seat, and a set of false teeth; and that it was approximately five to ten minutes before the police came. On cross-examination by the attorney for one of the defendants, witness Harvey testified that Kercher was seated in the left front seat of the car bent over the steering wheel. The car engine was stopped. Next to Kercher on his right and on the seat were a set of teeth and a hat alongside the teeth. "I only saw one plate not two plates and I don't know whether it was upper or lower. Kercher didn't speak or look at me. I don't know whether he was unconscious. The hat was not on his head; it was on the seat." On cross-examination by the attorney for the other defendant, witness Harvey stated that Kercher made no movements that he saw. " . . . There was no indication of life that I saw. . . . Kercher remained in the same position." On re-direct examination, witness Harvey testified "I didn't touch or do anything to Kercher."

Norman A. Palmer, testified for plaintiff, that he was a son-in-law of witness Harvey; that he lived upstairs, at 52 Cherry Street, Elgin, and that he was upstairs watching television when he heard the squealing of brakes. He got up and looked out the window facing Cherry Street and didn't see anything. "Then I heard a sound like two wagons banging together and soon

287

after a louder bang. I ran downstairs." He went to the scene, saw no police around, and stayed with Villegas, Sr., until the first squad car came, then went to the Kercher Buick which was up against the wall. "There was a fellow sitting or slumped over the wheel, in the car. I didn't talk to the man." On cross-examination he testified the man in the Buick was slumped directly over the wheel. "His head was laying on the wheel and he had no hat on. I didn't notice a hat or false teeth in the car or whether his mouth was open. I saw no bruises or blood on Kercher. I didn't observe him closely. I just looked in there and walked off. I noticed no signs of life. I don't know where his arms were."

David Henry McBride testified for plaintiff that he was secretary of the company, and in charge of the service department of same, which sold the 1953 Buick Roadmaster to Edward H. Kercher in 1953; that all of those models had turn signals as standard equipment, including the Kercher car; that the direction signal lever was located on the left side of the steering post, underneath the steering wheel, and it was to be operated manually. "For a left turn you would pull down on the lever and for a right turn you would turn the direction of the steering wheel and turn it up. And you had signal indication that would flash on the left or right both in the front and rear. This signal is operated only manually by the use of a hand or arm. The left hand is usually most convenient. Moving it up would give you the right hand turn and pulling it down would give you the left turn. Without this the signal stays in neutral and nothing happens." On cross-examination he stated that the turn signals automatically are shut off as soon as the car comes back into a 45 degree angle. "As soon as the wheel is brought back from the turn to approximately a 45 degree angle, it would turn off."

288

On behalf of defendants, Dr. Andrew J. Nowakowski testified that about 9:00 p.m. he received a call from the police department; that he drove from his office to the hospital, and was told to see E. H. Kercher. "I went to the ambulance drive and found a dead man. I examined the body. I found unequal pupils and no bleeding from the head. This indicated death from either a cerebral hemorrhage or coronary thrombosis. I found no fractured ribs, no contusions or abrasions. From the chest up the body was cyanotic or blueish color. Badly cyanotic. This indicates cerebral hemorrhage. That indicates this man had a massive cerebral hemorrhage and he died suddenly—instantly or within a minute or so." On cross-examination the doctor admitted that no autopsy was held on Kercher, and that the above was his presumptive diagnosis. "It might have been a coronary occlusion. Without an autopsy, it would be difficult to say which was the cause of death. A stroke is a cerebral hemorrhage."

Norman D. Smith, an Elgin City policeman, testified for defendant that he was cruising in a squad car with officer Santanni and at about 8:51 p.m. received a call to go to the scene of an accident, arriving there about two minutes later. "We saw Mr. Villegas with the child and the Kercher car. Another squad car came up a minute or two later. I saw Kercher in the Buick and noticed no signs of injury. Kercher was leaning straight ahead over the steering wheel with his head on his chest. His arms were just dropped at his side. I was unable to find any pulse or breathing. His mouth was somewhat open. His teeth were laying on the seat just to the right of him. I don't remember seeing a hat or glasses. My opinion was that Kercher was dead when I saw him." On cross-examination he stated, "My report shows that the man in the Buick was unconscious and doesn't say he was dead. We don't send persons to the hospital if they are dead. We sent Mr. Kercher to the

hospital by ambulance. We didn't know he was dead at that time."

Officer Santanni testified as to receiving the call with Lt. Smith and going to the car. "I noticed the left turn signal was on. I opened the door and a man was slumped over the steering wheel. He was leaning forward and his head was resting on the wheel. His arms were in his lap. Glasses and upper false teeth were on the seat to the right of the man. I don't recall seeing a hat. I made an examination of his pulse and couldn't get a heartbeat. The man's mouth was open. I know the man to be Mr. Kercher. There was no evidence of life in the man. He was sent to the hospital in an ambulance. My opinion was he was dead." On cross-examination he testified that he knew that the left rear blinker was going but he didn't know about the front one. "We sent him to the hospital for medical treatment, if necessary."

█ It is contended by appellant that the court erred in not admitting in evidence a photograph of the plaintiff in traction. The trial court did not abuse its discretion in denying this exhibit. There was ample evidence as to the boy's condition and as to the length of time he was in the hospital in traction. Dr. Howard Knight testified in detail as to the injury sustained by plaintiff, as to the length of time the plaintiff's leg was in traction and as to the opportunities he had to observe the plaintiff in bed and in traction. The boy's mother testified as to his leg and condition of health before and after the injury sustained on October 1, 1953; as to his treatment, disability and number of days in the hospital, and as to his five-month loss of schooling. Under this state of the record, the rulings were within the discretion of the trial judge and we are not inclined to disturb same.

██ Complaint is made by plaintiff as to the trial court's refusal to allow plaintiff to demonstrate his injuries to the jury. In Stegall v. Carlson, 6 Ill.App.2d

290

388, at p. 391, this court had occasion to review the authorities on this subject and we held that plaintiff should have been permitted to demonstrate the nature and extent of his injuries, or disability, resulting therefrom. We adhere to that decision. While the defendants did not object to plaintiff standing before the jury and allowing the jury to observe his legs, they did object to the attempt by the plaintiff's attorneys to have the witness "bear down and bend his leg." The court sustained the objection to this request. In Springer v. Chicago, 135 Ill. 552, wherein damages were sought against the city of Chicago because of the construction of a bridge and viaduct, the Supreme Court reviewed the authorities from other jurisdictions in accident cases, and stated, p. 562, as follows:

"It was also held in Hatfield v. Railroad Co., 33 Minn. 130, on the trial of an accident case, that the trial court had the power to require the plaintiff to walk across the court room, in the presence of the jury, in order that the jury might see how she had been affected by the injury. It is there said: 'As the object of all judicial investigations is, if possible, to do exact justice and obtain the truth in its entire fullness, we have no doubt of the power of a court, in a proper case, to require the party to perform a physical act before the jury that will illustrate or demonstrate the extent and character of his injuries.' This is in accordance with analogous cases in other branches of the law."

■ Defendants contend that the trial court properly granted their motion for directed verdict, relying on the proposition of law that where a loss or injury is occasioned by natural causes, such as could not be prevented by human skill and foresight, then the loss or injury is due to the act of God, for which defendants are not liable. Five cases are cited by defendants to support this contention. One of the cases relied on is Blue v. St. Clair Country Club, 4 Ill.App.2d 284, which

291

was reversed and remanded by the Supreme Court in 7 Ill.2d 359, 131 N.E.2d 31. The principal case relied on by defendants is Wald v. Pittsburg, C., C. & St. L. R. Co., 162 Ill. 545, wherein an unprecedented flood caused the baggage of a passenger to be swept away and the defense was, as in our case, that the loss was occasioned exclusively by natural causes, such as could not be prevented by human care, skill and foresight. At the close of all the evidence the court instructed the jury, as requested by defendant, that plaintiff was not entitled to recover, and that a verdict should be returned for defendant. On the verdict so returned, judgment was entered, and this judgment was affirmed by the Appellate Court. The case was brought to the Supreme Court under a certificate of importance. The Supreme Court reversed and remanded stating that this was a question of fact and that the common carrier was not exempt from liability for a loss occasioned by an act of God if the carrier had been guilty of any previous negligence which brought the property in contact with the destructive force or unnecessarily exposed it thereto, and that unnecessary delay of the carrier which subjected the goods in its possession to a loss by an act of God which they would not otherwise have met with was of itself such negligence as would make the carrier liable for the loss. To the same effect is another case relied on by defendants, Sandy v. Lake St. El. R. Co., 235 Ill. 194, wherein the court held, at p. 202, "If there is any intervening human agency which contributes to cause the damage it cannot be considered as caused by an act of God." Defendants rely on McClean v. Chicago G. W. Ry. Co., 3 Ill.App.2d 235. This case is also cited by plaintiff, and will be referred to hereinafter. The remaining case cited by appellee is Welfelt v. Illinois Cent. R. Co., 149 Ill. App. 317. That case also held, at p. 326:

" 'A loss or injury is due to the act of God when it is occasioned exclusively by natural causes such as could

292

not be prevented by human care, skill and foresight.' 'If there is any intervening human agency which contributes to cause the damage it cannot be considered as caused by an act of God.' "

■ Appellant contends that there was ample evidence in the record to take the case to the jury. In McClean v. Chicago G. W. Ry. Co., supra, the court held that the defense of an act of God was an affirmative defense and that it was for the jury to determine whether the driver of the defendant's truck had an attack of illness. In Meyer v. Buckman, 7 Ill.App.2d 385, we held that the party asserting an affirmative defense had the burden of proving such defense. In the case of Geraghty v. Burr Oak Lanes, Inc., 5 Ill.2d 153, the Supreme Court held, at pp. 163–164:

"It is fundamental law in our jurisprudence that all controverted questions of fact, in a jury trial, must be submitted to the jury for decision. This is primarily the exclusive function of the jury, and to withhold such questions from its consideration is to usurp its function."

■ A motion for a directed verdict or for a judgment notwithstanding the verdict presents the single question whether there is in the record any evidence which, standing alone and taken with all its intendments most favorable to the party resisting the motion, tends to prove the material elements of his case. Seeds v. Chicago Transit Authority, 409 Ill. 566; Lindroth v. Walgreen Co., 407 Ill. 121 at p. 130; Gorczynski v. Nugent, 402 Ill. 147, 156; Weinstein v. Metropolitan Life Ins. Co., 389 Ill. 571, 576. We are not concerned with the weight or credibility of the evidence, but only with the narrow question whether there is any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the case to the jury. Lindroth v. Walgreen Co., supra, at p. 130.

 Examination of the evidence in this case discloses that plaintiff, without fault, was seriously injured as a result of being run over by deceased's car. Deceased Edward Kercher was driving his Buick Roadmaster sedan down Cherry Street, which was a fair grade. He had, within minutes before, made a sale as an employee of the Electrolux Corporation in the customary manner. The scene of the occurrence (Grove Avenue north of Cherry) was between his residence (Cedar and Cooper) and the place of the sale (McClure and Lawrence). His parking lights were on. His right blinker, indicating a right turn, was in operation; his car turned the corner; his tires squealed. All of these actions required the exercise of judgment. The evidence further shows that the car went on the west side of Grove Avenue, jumped the curb and bumped the utility pole a glancing blow on the yard side. The six to seven inch curb did not deflect the driver into either the house or the pole, but the car proceeded through the relatively narrow space between the Villegas house, and the pole and the trees, as shown in photograph marked plaintiff's exhibit 5. The objects struck were a small boy, difficult to see, and an automobile parked in the dark without lights, and finally a brick wall where the car came to a stop. We are called on by appellees to say that all minds would agree that Kercher was either dead, or in the process of dying, during this entire period of time. It can as easily be contended that his death was caused as a result of going through this harrowing experience, during all of which time he was able to maneuver his car past and between immediately visible obstructions. It can as easily be contended that he had been dozing, that as a result thereof he had no proper and sufficient control over his car and did not keep a proper lookout, and when he struck the curb this brought him back to his senses and he was able to operate his car. After the impact his glasses, his upper plate and his hat were

all resting on the seat beside him. It can as easily be contended that his hat, his plate and his glasses were placed on the seat by him, as it can be said that these were thrown there by the resultant shock of the collision. While Dr. Nowakowski testified that he went to the ambulance drive at the hospital and found a dead man and gave his presumptive diagnosis that deceased Kercher died suddenly, his language was qualified by stating, "This *indicated* death from either a cerebral hemorrhage or coronary thrombosis. . . . From the chest up the body was cyanotic or blueish color. Badly cyanotic. This *indicates* cerebral hemorrhage. That *indicates* this man had a massive cerebral hemorrhage and he died suddenly." He admitted on cross-examination that no autopsy was held on Kercher and that without an autopsy "it would be difficult to say which was the cause of death." We cannot say that all reasonable minds would reach the conclusion suggested by defendants. We cannot say as a matter of law that the injury in this case was occasioned exclusively by natural causes, such as could not have been prevented by human care, skill and foresight.

For the error of the trial court in directing verdict in favor of the defendants, the cause is reversed and remanded for a new trial.

Reversed and remanded.

DOVE, P. J. and CROW, J., concur.