TONI PARSON, Plaintiff-Appellee, *v.* THE CITY OF CHICAGO, Defendant-Appellant.

First District (4th Division)   No. 82—1528

Opinion filed August 18, 1983.

384

Stanley Garber, Corporation Counsel, of Chicago (Jerome A. Siegan and Frank W. Nagorka, Assistant Corporation Counsel, of counsel), for appellant.

Carr & O'Rourke and William J. Harte, Ltd., both of Chicago (William J. Harte, of counsel), for appellee.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Plaintiff was severely and permanently injured in 1980 when a car after hitting a pothole on a street veered to its right and struck her. She sued both the driver of the car and the city of Chicago, as owner of the street. The jury returned a verdict against both for $1,250,000. Only the city of Chicago appeals. On appeal the city contends that:

(1) it had no duty to improve the street and that arguments and evidence of plaintiff could have led the jury to find it liable because no curbs had been installed;

(2) the trial court erred in refusing to allow evidence there had been no prior accidents on this street;

(3) the trial court erred in refusing to grant a mistrial after certain television commentaries and newspaper articles on the failure of asphalt crews to actually do their work;

(4) the trial court erred in permitting the admission of a gruesome photograph of plaintiff after she was injured;

(5) testimony concerning the diminution in plaintiff's earning potential was improperly admitted.

This court finds no reversible error and affirms.

The accident occurred on South St. Louis Street in Chicago. South St. Louis as characterized by both sides is a W.P.A. street built during the depression and later taken over by the city. It is much narrower than the usual street, being 18 feet wide, and has no curbs or gutters. Cars parking along the street pull up next to the sidewalk.

On April 19, 1980, until about 10 p.m. plaintiff was a healthy, normal 17-year-old senior in high school. She was very active in sports. She and her boyfriend, Mark Myers, had been laying sod that afternoon. She and Mark had pizza and then sat on the front porch. About 10:15 they walked to Mark's car which was parked next to the sidewalk. Plaintiff stood leaning against Mark's car conversing with him until the accident.

About this time the Duncans, also defendants but not appellants in this case, turned down St. Louis because a freight train blocked their route on West 55th Street. Thelma Duncan was driving; her husband was a passenger. According to their testimony, when the car hit a pothole in the street it veered to the right and ran into plaintiff. Several neighbors testified that immediately after the accident Thelma Duncan was hysterically crying that she had hit a hole and lost control of the car.

There is no dispute that there was a pothole in the street. According to police officer McCarthy, the investigating officer, the areas of the pothole he examined, for one minute by flashlight, were one to three inches deep. The other witnesses, all people who were familiar with the street, testified the pothole, which was 2½ to three feet wide and four feet long, ranged from two to eight inches in depth, it being deeper in some places than in others. The city produced evidence that there had been work crews out on the street in October, November and December, 1979, and March 1980. However, again, there were about eight witnesses who testified that the pothole had been there at least three months. There was some evidence that complaints had been made about the pothole. There was also evidence that unimproved streets such as this were lowest on the priority list for street repairs, being repaired only on an emergency basis or complaint basis where it was verified that repairs were needed. There was a different standard of maintenance care for improved and unimproved streets; unlike unimproved streets, the city attempts to bring the surface of improved streets back as nearly as possible to the original condition.

The Duncan car struck plaintiff and she ended up under the automobile. After the car stopped, she looked up and saw "on my hip it was just a bunch of flesh and muscle and blood was all over and I just

started screaming." The pain caused her to scream although she was in a semiconscious state and she "felt like dying." The paramedic who responded to the call found her suffering from traumatic amputation of the leg as well as spinal, neck, head and chest injuries. Plaintiff was rushed to the hospital. Dr. Saletta, the surgeon who first saw her, testified all the muscles of her anterior thigh were lacerated up to the inguinal skin crease, the femur and upper part of the thigh bone were fractured and only an inch of skin held the lower leg to the upper thigh. Dr. Saletta felt that he had no choice but to operate. Muscle had to be removed along with the remainder of the femur, because there was insufficient muscle and skin to cover the area.

After surgery, plaintiff while in the hospital was in a great deal of pain. When she first saw herself in the mirror she hated it and determined to kill herself because she could not stand people looking at her. Plaintiff still has trouble wearing a prosthesis, which Dr. Saletta said was probably due to insufficient muscular protection over the hip socket. Plaintiff testified she had trouble venturing out of her home; she feels people will stare at her.

Dr. Wolin, a psychiatrist who treated plaintiff after the accident, testified that she had suffered a complete personality change. Dr. Fischer, a vocational expert witness, examined plaintiff for purposes of testifying. He administered a battery of standard psychological tests. Based on the tests he found a deterioration of functions which he believed was due to her emotional difficulties. He concluded she had very significant depression relative to the loss of the limb and the loss of the activities that she could engage in if she had the limb. He found because of her psychological condition she was incapable of any substantial gainful employment at the time. He felt that after undergoing between one and two years of a multiple impact, highly intense rehabilitation program, including continued regular individual psychotherapy sessions, regular group therapy sessions with other people who have amputations, antianxiety medication, antidepressant medication and even possibly additional pain medication, vocational counseling and rehabilitation which incorporate occupational therapy and evaluation, she could become employable. This therapy would cost $6,300 a week.

Fischer also testified as to the annual salaries of a general secretary, a word processor operator and a worker in health services. The city objected to this testimony on the grounds there was no showing what plaintiff might have done for a living.

After receiving proper instructions the jury deliberated and returned a verdict for plaintiff jointly and severally against both defend-

ants for $1,250,000.

## I

■ The city first contends that since the plaintiff was "from opening statement to closing argument" allowed to put before the jury the dichotomy between W.P.A. streets and improved streets, the jury could improperly have found it liable for failure to provide a better quality street even though the street was properly maintained. We do not need to consider whether a city can ever be required to improve a street which it accepts no matter in how dangerous a condition it was when accepted, since we find the jury was not misled into believing that was an issue.

While the city without citation refers in its argument to the "numerous occasions" when plaintiff was allowed to present argument and evidence as to what a municipal government owes city residents in terms of public improvements, in fact it cites only testimony distinguishing the types of streets and plaintiff's statement in closing argument that residents of St. Louis Avenue were second-class citizens.

The witnesses without objection testified that a W.P.A. street had no curbs and gutters. The city only objected to evidence that improved streets had curbs and gutters; information certainly within the common knowledge of any juror. Since plaintiff was attempting to prove, unsuccessfully, that curbs could act as barriers, evidence that one type of street had curbs and one did not was relevant to the question how dangerous a pothole could be and the need for immediate repairs. Likewise the absence of gutters in the one and presence in the other could be found to affect the rate of deterioration and thus relate to the frequency of need for repairs. As one of the city employees testified, unimproved streets needed more maintenance than improved streets. Thus the jury could have easily found that the city's practice of handling such streets last and only on an emergency or verified complaint basis did not fulfill its duty to reasonably maintain such streets. We agree with the judge's decision at trial that such evidence would not suggest a duty to make public improvements since the jury would be properly instructed.

Plaintiff's argument that residents of the street were second-class citizens did not refer to the fact the street was not improved but to the fact the street was last on the priority list for repairs.

The trial lasted for about two weeks. Over this time the jury heard much evidence, of which the testimony that improved streets had curbs and gutters was only a small part. Plaintiff's closing argument correctly set forth the grounds on which recovery was being

sought, namely that the potholes had been allowed to remain and that the city had failed to warn the general public or place barricades. Likewise the jury was not only properly instructed as to the issues but was expressly instructed that the city had no duty to install curbs and gutters on that street. The jury could not have been misled into believing that it could find the city liable merely because of their absence.

## II

■ The city next contends that its defense was prejudicially compromised by the trial court's refusal to allow testimony that during the time Mark Myers was there, 300 to 400 vehicles had travelled down the street but that there had been no accidents, although some had hit the pothole. The city contends that since a municipality must use only reasonable care in maintaining its streets, the absence of other accidents on the street would be probative evidence that it had been using reasonable care in maintaining the street. The city does not, in its brief on appeal, contend the evidence would be relevant for some other purpose.

It is doubtful whether the city offered any real evidence as to the number of cars which passed the spot prior to the accident. Most of the statements of Mark Myers that the city would like to rely on came not from the offer of proof of Myers' testimony but from a prior deposition of his used by the city to impeach his answers during the offer of proof. But a deposition used to impeach is not evidence in itself. *People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752, *appeal denied* (1975), 61 Ill. 2d 599; 81 Am Jur. 2d *Witnesses* sec. 599 (1976).

In any event as the trial court noted there was no evidence of the angle, the condition of the vehicle, familiarity of drivers with the potholes, and other factors. Generally evidence of the absence of prior accidents is proper only if the offering party lays a proper foundation by establishing that such absence took place under conditions substantially similar to those surrounding the accident sued upon. (*Smith v. Verson Allsteel Press Co.* (1979), 74 Ill. App. 3d 818, 393 N.E.2d 598, *appeal denied* (1979), 79 Ill. 2d 624.) Absent such proof the trial court did not abuse its discretion in refusing to admit the evidence, particularly since "evidence of absence of accidents has less probative value than evidence of previous accidents, and thus is more easily outweighed by the factor that the collateral issue will result in jury confusion *** Evidence of absence of accidents usually involves generally unreliable negative evidence *** and does not tend directly to prove

absence of negligence." *Grubaugh v. City of St. Johns* (1978), 82 Mich. App. 282, 288, 289, 266 N.W.2d 791, 794, *appeal denied.*

Furthermore it is difficult to see how evidence of lack of prior accidents could help establish proper maintenance, although it might be relevant to the issues of causation or constructive notice, neither of which was argued by the city on appeal. That the pothole existed was undisputed. Proper maintenance includes the filling of potholes and the repairing of deteriorated portions of the roadway. (*Harding v. Chicago Park District* (1975), 34 Ill. App. 3d 425, 339 N.E.2d 779, *appeal denied* (1976), 62 Ill. 2d 589.) Even if the precise type of accident which did occur was unexpected, it is not unforeseeable that accidents can be caused by potholes. And the jury did determine that the pothole did in fact cause the accident.

### III

■ While the trial was in process in February 1982, Walter Jacobson, a well-known television commentator, presented a two-day commentary on the city's street maintenance crews. He suggested that the crews were not doing their work, were dumping asphalt in backyards and alleys instead of filling the potholes. The Chicago Sun-Times also picked up the story. The trial court conducted a careful and extensive *voir dire* during which it was pointed out that the revelations were irrelevant to the case if for no other reason that the accident took place in 1980 not 1982. While several of the jurors had seen the news article or the commentaries or at least had heard of them, they all agreed that neither would influence their decision. The trial court instructed the jury to disregard the commentaries and newspaper report and concluded a mistrial was not necessary.

The determination whether or not a juror can weigh the evidence impartially rests in the sound discretion of the trial court which will not be set aside unless it is against the manifest weight of the evidence. (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) In a typical instance of outside publicity the examination of the jurors is probably the most valuable means of ascertaining the partiality or impartiality of the jurors. (*People v. Spagnola* (1970), 123 Ill. App. 2d 171, 260 N.E.2d 20, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 653, 91 S. Ct. 1389.) Although many of the jurors stated they had read the article or heard the commentaries or heard talk of them this alone is not decisive as it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (*Spagnola.*) Here the trial court could reasonably conclude that the jurors could set aside what they had heard and decide

the case on the evidence alone. The city points to the hesitancy of one juror who said he was not sure the news report would have any effect on him whatsoever. However he went on to state that he did not think it would influence his decision one way or the other and that it would not make him more prejudiced against the city.

## IV

■ The city next contends that a gory photograph taken shortly after the accident and before surgery was improperly admitted since it so inflamed the jury as to prejudice the defendant and there was other evidence from plaintiff and other witnesses as to her injuries and the pain suffered. The admission of photographs is within the discretion of the trial court. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872.) Photographs may be admitted to show the physical condition of a person at a particular time or the existence, nature and location of wounds or injuries and the fact that a photograph is of a gruesome nature does not necessarily render it inadmissible. (*In re Brooks.*) Nor does the fact that other witnesses testified as to the plaintiff's injuries. (*Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *affirmed* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204.) It is an old cliche that a picture is worth a thousand words. Much that sounds cold coming from a witness may be better conveyed by a photograph.

*Hulsebus v. Russian* (1969), 118 Ill. App. 2d 174, 254 N.E.2d 184, *appeal denied* (1970), 42 Ill. 2d 586, and *Villegas v. Kercher* (1956), 11 Ill. App. 2d 282, 137 N.E.2d 92, relied upon by the city, are not in point since in those cases the appellate court merely found that the trial court's exclusion of evidence was not an abuse of discretion.

## V

■ Lastly, the city contends that Dr. Fischer's testimony as to the annual salaries of positions that would have been available to plaintiff was improper because there was no evidence showing how plaintiff's injuries would in any way prevent plaintiff from earning those salaries. While the city objected to Fischer's testimony on other grounds, this contention was apparently not raised either at trial or in the post-trial motions and thus was waived. (*Johns-Manville Products Corp. v. Industrial Com.* (1979), 78 Ill. 2d 171, 399 N.E.2d 606; *In re Marriage of Melton* (1981), 93 Ill. App. 3d 338, 417 N.E.2d 220; *Hammonds v. Inland Tugs Co.* (1979), 75 Ill. App. 3d 377, 393 N.E.2d 1328; *Northern Trust Co. v. Winston* (1975), 32 Ill. App. 3d 199, 336

N.E.2d 543.) In any event, since Dr. Fischer testified that plaintiff was incapable at the time of participating in any substantial gainful employment and would continue to be unless she had extensive psychological rehabilitation, the evidence was clearly relevant.

The city also complains of plaintiff's suggestion in closing argument that the jury could multiply a minimal figure of lost earnings by the number of years she might have worked. Again no objection was made at the time nor was it mentioned in the post-trial motion. Accordingly the objection was waived. *Sommer v. City of Taylorville* (1978), 59 Ill. App. 3d 765, 375 N.E.2d 1031; *Quigley v. Snoddy* (1968), 102 Ill. App. 2d 232, 242 N.E.2d 775.

■ The amount of a verdict is largely within the discretion of the jury. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63, *appeal dismissed* (1959), 361 U.S. 127, 4 L. Ed. 2d 180, 80 S. Ct. 256.) While the city asked for a *remittitur*, we do not find that the verdict was so excessive as to be clearly erroneous or to show prejudice or passion, particularly since the trial judge, who presided at the trial and saw the plaintiff in person, approved the verdict. *Orlandi v. Caraway* (1973), 9 Ill. App. 3d 628, 293 N.E.2d 337.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.