SADIE A. CARTER, Adm'r of the Estate of Robert E. Carter, Deceased, Plaintiffs-Appellees, *et al.*, v. INDIANA HARBOR BELT RAILROAD COMPANY *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—87—3601, 1—87—3632 cons.

Opinion filed November 3, 1989.

Baker & McKenzie and Modesto, Reynolds & McDermott, both of Chicago (Francis D. Morrissey, Thomas F. Tobin, Michael A. Pollard, Thomas W. Cushing, and Michael W. Rathsack, of counsel), for appellants.

Corboy & Demetrio, P.C., of Chicago (Philip H. Corboy, Thomas A. Demetrio, and Robert J. Bingle, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff Sadie A. Carter, administrator of the estate of decedent Robert E. Carter, and plaintiff Rickey Carter filed suit against defendant Indiana Harbor Belt Railroad Company (the railroad), Transportation Displays, Inc. (TDI), a subsidiary of Winston Network, Inc., and WCTU Railway Company, after Robert and his son Rickey were struck by a passing train while painting a viaduct. Robert died as a result of his injuries. A jury awarded damages to Rickey in the sum of $60,000 and to the estate in the sum of $2,357,800 against the railroad and TDI, and the court entered judgment on the verdicts. The railroad and TDI appeal, and the appeals were consolidated. The trial court directed a verdict in favor of WCTU Railway, and plaintiffs do not appeal from that decision. No third-party actions or cross-claims were filed.

On appeal, the railroad makes the following contentions: that the jury's verdicts are against the manifest weight of the evidence because TDI's conduct in permitting plaintiffs to work on a viaduct without notifying the railroad was an unforeseeable intervening act; that the trial court erred by precluding it from introducing into evidence a provision contained in the contract between TDI and an advertiser, establishing TDI's control over plaintiffs; that a mistrial

should have been granted following emotional outbursts by plaintiffs' witnesses; and that the damages awarded were excessive as a matter of law.

TDI's contentions are as follows: that it is entitled to judgment notwithstanding the verdict because it owed no duty to plaintiffs and because its conduct was not the proximate cause of the injuries; that it was error to introduce evidence of a post-occurrence notification procedure which TDI adopted; and that the court erred in admitting into evidence the contract between TDI and an advertiser for the lease of the viaduct.

On June 30, 1981, a railroad employee discovered a door on a boxcar had bulged outward due to an unsecured load of newspaper rolls which were each 20 feet high and 5 feet in diameter, and weighed 8,000 pounds. The goods were reloaded and the bulge was repaired, but there was no protection for the doorway if the paper shifted again, and there was nothing to prevent the shifting. On June 30, the car was placed back onto a 70-car train. The load shifted, and the door bulged once again.

The train, moving at five miles per hour, passed a viaduct owned by the railroad and being painted by decedent and Rickey. Two other trains had already passed the painters with no problems. Charles Davis, a switchman for the railroad, sat in the engine at the head of the train and he observed the scaffold and the men working on it, but could see no problem as he looked back to see the train moving past the painters. Rickey looked back from where he stood on the scaffold and saw that one boxcar had a bulge. He heard a loud screeching sound as the train struck the scaffold, and the door of the boxcar snagged the hooks of the scaffold, pulling it down. Rickey was injured, and decedent died from his injuries on August 27, 1981.

The trainmen were not aware of the accident. When the train arrived in the yard, the 16th car forward from the caboose had a door handle torn off, a bulge in the door, and fresh scrape and burn marks on the door. The door bulged out 8 to 10 inches. An investigation report indicated there was a large roll of paper loaded against the door, causing a 12-inch bulge.

TDI's contract with the railroad gave TDI exclusive rights to sell advertising on the viaduct in question. The railroad and TDI shared the advertising revenue.

In 1975, TDI rented advertising space on the same viaduct and informed the railroad. In 1978, TDI again rented the same advertising space, and again informed the railroad.

In 1981, TDI entered into an agreement with Pal Construction for

an advertisement on the viaduct. The contract between TDI and Pal provided that the railroad must be notified "prior to start of any work or painting at this location." The railroad received no notification that decedent and Rickey would be painting the viaduct in June 1981. Decedent owned a painting company, B & G Quality Signs, and was hired by TDI to do the painting.

Evan Gollrad, TDI's account executive in Chicago for 25 years, testified that neither Pal nor B & G was responsible for informing the railroad of the painting. Gollrad stated that even if he had known the painting was to take place on June 30, 1981, he would not have notified the railroad.

The TDI advertising contract was prepared in New York and was signed by Pal on May 26, 1981. The contract was returned to TDI in New York and was signed by TDI on July 29, 1981.

After the accident, TDI adopted a new procedure. It advised the railroads by letter and telephone of any painting that was to be done near the tracks.

The railroad first contends that the jury's verdicts are against the manifest weight of the evidence because TDI's failure to notify the railroad of the painters' presence on the viaduct was an unforeseeable intervening cause absolving the railroad of any liability. The railroad relies on the fact that TDI controlled the painting of the viaduct because it had the exclusive right to lease the viaduct for advertisement; that TDI had previously rented the viaduct for advertisement; that TDI had previously notified the railroad of the painting of that viaduct; that TDI's contract with Pal required notification to the railroad; and that TDI controlled when the painters could work on the viaduct since its contract with B & G required the painters to comply with certain provisions before the painting could begin.

The question of proximate cause is ordinarily a question of fact for the jury. (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74.) As long as a party's conduct was one of the proximate causes of an injury, it is liable for negligent conduct even where other causes were present. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9.) Even where an injury would not have occurred but for the negligence of another party, a negligent party cannot avoid responsibility for its own negligence. *Sears v. Kois Brothers Equipment, Inc.* (1982), 110 Ill. App. 3d 884, 443 N.E.2d 214.

In order for an intervening act to sever the initial wrongdoer's culpability, the intervening event must be unforeseeable as a matter of law. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.) Foreseeability means that which is objectively reasonable to ex-

pect, not anything which might conceivably occur. (*Winnett v. Winnett* (1974), 57 Ill. 2d 7, 310 N.E.2d 1.) An intervening cause is a new and independent force which breaks the causal connection between the original wrong and the injury, and the new force becomes the direct and immediate cause of the injury. However, the intervention of independent concurrent forces will not break a causal connection if the intervention was itself probable or foreseeable. *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 50 N.E.2d 497.

We hold that TDI's conduct was not a superseding intervening cause. Instead, it was a concurring cause. The boxcar was negligently repaired and repacked by the railroad. The railroad was required to follow the field manual and safety rules of the Association of American Railroads (AAR). Those rules provide that rolls of newsprint loaded into closed cars must have doorway protection to prevent the rolls from coming into contact with the doors of the boxcar. The rules provide further that when a boxcar is bulged due to roll paper stock, the cause of damage can be failure to apply doorway protection, or failure to protect lading from contacting with doorway protection. The rules set forth various ways of bracing the load.

The railroad's superintendent of equipment, Steven Papa, testified that a carman must inspect the cars to make sure they are safe. The men are required to know the AAR safety rules. Robert Wiksten, a railroad employee under Papa's supervision, performed the repair on the 2½-foot bulge on the boxcar door on June 28, 1981. In 16 years as a carman, Wiksten had never been supplied with the AAR safety materials, and he was not familiar with the AAR's recommended methods of bracing a load. After the door was repaired on June 28, a crane was used to reload the rolls and the doors were rehung and latched, but no protection was used on the doorway to prevent the rolls of paper from shifting again and creating another bulge. A July 13, 1984, railroad memorandum written by Wiksten's supervisor states: "I had a conversation with Mr. Wiksten in connection with the repair work performed. *** There was no door protection to prevent the rolls from shifting against the side doors. After the rolls were shoved back into the car, they straightened the door to the best of their ability, closed and secured them in position. When the car departed the Repair Track, the doors were secured top and bottom with a slight bulge of the doors at the bottom." Papa testified that if a car is improperly loaded, the railroad has an affirmative duty to prevent it from moving into traffic. Papa was concerned that a bulged door could strike railway equipment or some other structure.

It would be impossible to conclude, based on the evidence in the

record, that the railroad could not reasonably foresee that the presence of either railway equipment or some other structure near the tracks would not come into contact with a door that was almost guaranteed to bulge considerably, as a result of improperly loaded rolls of paper weighing 8,000 pounds crashing against the door.

The railroad argues that its negligence merely created a condition upon which TDI acted. The bulged boxcar door had not come to rest in a position of apparent safety. Thus, a new force did not intervene after the forces set in operation by the railroad came to rest in a position of apparent safety. (See *Orrico v. Beverly Bank* (1982), 109 Ill. App. 3d 102, 440 N.E.2d 253.) The railroad's negligence merely combined or concurred with the operation of TDI, thus producing a joint effect. (See *Chapman v. Baltimore & Ohio R.R. Co.* (1950), 340 Ill. App. 475, 92 N.E.2d 466.) The jury was entitled to find that the railroad was liable for the injuries sustained by plaintiffs.

■ The railroad next contends that the trial court erred in precluding the railroad from introducing into evidence relevant contractual provisions establishing the nature and extent of TDI's control over the painters. The contract between TDI and Pal required the painters to provide a certificate of insurance to TDI before the painting could begin. The trial court refused to permit any reference to the liability insurance provision for fear it would prejudice plaintiffs. The court allowed the railroad to examine Gollrad on the terms of the contract in detail, without using the word "insurance." (See *Guardado v. Navarro* (1964), 47 Ill. App. 2d 92, 197 N.E.2d 469; *Rubinstein v. Fred A. Coleman Co.* (1959), 22 Ill. App. 2d 116, 159 N.E.2d 379.) Thus, Gollrad testified that TDI enforced a certain provision in the contract with respect to every painting contractor and refused to permit painting until the contractor complied with the provision. Gollrad agreed that TDI controlled the painters, and that if they did not comply, they would not work. The railroad argues that disclosure of insurance is proper to establish control (see *Pagano v. Leisner* (1955), 5 Ill. App. 2d 223, 125 N.E.2d 301), and that here it evidenced the nature and extent of TDI's control over the painters, thus establishing that TDI's control constituted an intervening cause of the accident.

The railroad admits that it was able to elicit testimony from Gollrad that TDI controlled the painters. Moreover, TDI was found to be liable. The word "insurance" could not possibly have negated the effect of the railroad's own negligent conduct. We hold that the trial court's ruling was correct, and did not deny the railroad the opportunity to show the nature and extent of TDI's control over the painters.

The railroad also contends that the trial court erred in denying its

motion for mistrial following the emotional outbursts by decedent's widow, by Rickey Carter, and by Dr. Charles Malon Chuman, decedent's physician. All three witnesses shed tears while testifying. The railroad argues that as a result, the jury's verdicts are the result of passion and prejudice, and asks that we grant a new trial on this basis.

■ The trial court is in the best position to determine whether any showing of emotion by a witness is such that it would prejudice the jury, and absent apparent error, we will not reverse that decision. (*Bucker v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 216 N.E.2d 14.) Emotional outbursts in a personal injury action do not constitute grounds for a mistrial where the conduct was not intentional, simulated or improperly motivated, and its effect is not so prejudicial as to have unquestionable influence upon the jury's ability to try the issues fairly. (*Costello v. Chicago Transit Authority* (1976), 40 Ill. App. 3d 461, 352 N.E.2d 417; see also *Soto v. E.W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 452 N.E.2d 572; *Gourley v. Chicago & Eastern Illinois Ry. Co.* (1938), 295 Ill. App. 160, 14 N.E.2d 842.) We find no evidence of intentional emotional outbursts here, and we believe the trial court was entitled to find that the effect was not so prejudicial as to preclude the jury from trying the issues fairly.

The railroad finally contends that the damage awards to decedent's estate were excessive as a matter of law and self-evidently the result of passion and prejudice. The jury awarded $85,400 for decedent's medical and funeral expenses; $482,430 for loss of money, goods and services suffered by decedent's wife and children; $1,200,00 for loss of society suffered by decedent's wife and children; $200,000 for decedent's disability and disfigurement suffered prior to his death; and $390,000 for pain and suffering experienced by decedent prior to his death.

■ An award for personal injuries is not subject to mathematical computation, and the propriety of the amount of damages to be awarded is peculiarly a question of fact for the jury. (*Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 349 N.E.2d 413.) This court will not substitute its judgment for that of the jury as to the sum to be awarded unless the total amount of the verdict falls outside the limits of fair and reasonable compensation, or results from passion or prejudice, or is so large as to shock the judicial conscience. *Jones v. Karraker* (1983), 98 Ill. 2d 487, 457 N.E.2d 23; *Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 349 N.E.2d 413; *McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 481 N.E.2d 787.

■ The railroad argues that the jury's passions were heightened by the trial court's improper ruling permitting plaintiffs to introduce a photograph of decedent's injuries. The admission of photographs is within the discretion of the trial court. (*Parson v. City of Chicago* (1983), 117 Ill. App. 3d 383, 453 N.E.2d 770.) They may be used to depict the existence, nature, severity and location of injuries, and to show resultant pain and suffering. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872; *Kallas v. Lee* (1974), 22 Ill. App. 3d 496, 317 N.E.2d 704.) Here, the photograph was accurate and properly identified, and the fact that it was gruesome does not require the trial court to exclude it from evidence. See, *e.g.*, *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27; *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *aff'd on other grounds* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; *Parson v. City of Chicago* (1983), 117 Ill. App. 3d 383, 453 N.E.2d 770; *Kallas v. Lee* (1974), 22 Ill. App. 3d 496, 317 N.E.2d 704.

■ The railroad further argues that the $482,430 award for loss of money, goods and services was excessive and speculative because decedent earned only $17,917 in 1980 and $5,462 in the first half of 1981. Decedent was a journeyman sign painter and previously worked for Beverly Sign Company. He earned over $20,000 annually in 1975, 1976 and 1977. Gerald Ryan, owner of Beverly Sign, testified that decedent worked for him from 1957 until 1978, that he was an excellent painter, was highly respected and had trained many other painters. Richard Kaczmarski, a Beverly Sign employee for 40 years, testified that decedent was one of the top 10 sign painters in Chicago. In 1978, defendant started B & G Quality Sign. At B & G, decedent earned $15,511 in 1979, $17,917 in 1980, and $5,462 in the first half of 1981. There was evidence presented of the union scales for a journeyman sign painter. At the time of trial, Beverly paid the average sign painter $30,243 annually. In addition, there was evidence as to the amount of work decedent performed at home for his family. Decedent was 45 years old and had a life expectancy of 30 more years. He was survived by his 42-year-old wife and six children ranging from 10 to 28 years old. Under the facts presented here, we find that the award for loss of money, goods and services is not excessive.

■ The railroad also maintains that decedent was unconscious and therefore incapable of experiencing conscious pain and suffering, that he never regained consciousness, and thus, that the $390,000 award for decedent's pain and suffering was purely speculative. Dr. Chuman, the treating neurologist, testified that decedent suffered severe injuries to the right side of his face and the left side of his brain.

There was no damage to the center of the brain. Decedent could not speak, but he communicated by movement of his right hand and thumb. He fractured the front and back of the skull, both ear bones, his right upper and lower jaw, a rib, one arm, one finger, and the side of his head. He suffered severe facial lacerations, including having his right eye socket torn off. The right ear was torn off, and he could not hear from the left ear. The nerve to the upper and lower teeth was torn off but was still functional and thus any movement to the jaw by the hospital staff would cause pain.

Dr. Chuman testified that after surgery on June 30, decedent moved his arms and legs in a thrashing manner. During the following weeks, it was necessary several times to remove dead tissue, necessitating going into the area of live tissue and nerves. Even just changing the dressings, which was necessary every four to six hours, caused decedent to start thrashing and jumping, pulling on his restraints. During July and August, surgery was performed seven times, including removal of the right eye, cleaning facial tissue, and reconstructing the jaw bone. Dr. Chuman testified that sometimes decedent was awake and experiencing pain, and would grimace in response to touch. As time went on, decedent became more physically coherent with his movements. While he could not speak, his movements became much more purposeful. Dr. Chuman opined that the injuries sustained by decedent actually produced excruciating pain and suffering.

In view of the uncontradicted evidence presented to the jury, we decline to disturb the award for pain and suffering.

We conclude that the verdict in behalf of decedent's estate does not fall outside the limits of fair and reasonable compensation, that there is no indication that it results from passion or prejudice, and that it is not so large as to shock the judicial conscience under the facts of this case. See *Jones v. Karraker* (1983), 98 Ill. 2d 487, 457 N.E.2d 23; *McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 481 N.E.2d 787.

■ Turning to TDI's contentions, TDI first maintains that it is entitled to entry of judgment notwithstanding the verdict or a new trial because it either owed no duty to plaintiffs or its conduct was not a proximate cause of plaintiffs' injuries. Initially we note that the railroad filed no claim for contribution against TDI. A duty is an obligation to conform to a certain standard of conduct for the protection of another against an unreasonable risk of harm. (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 456 N.E.2d 116; *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538.) It is not essential that

defendant foresee the precise injury suffered by plaintiff. *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 382 N.E.2d 1205.

■■■ TDI maintains that the "uncontradicted evidence is that TDI could not and did not exercise any control over the plaintiff painters." As we have already discussed, Gollrad admitted TDI's control, and the contractual provisions between TDI and its customers support that admission. TDI concedes that one provision in the Pal/TDI contract "did require the painters to produce to TDI a certificate of insurance before painting was begun." TDI had in fact informed the railroad that the viaduct in question was to be painted on two prior occasions, but failed to do so in June 1981. TDI always notified the Chicago and North Western Railroad when painters were going to be painting its property. It did so expressly for safety purposes. TDI had an obligation to conform to the standard of giving notice to the railroad in order to protect painters, engaged by TDI, from an unreasonable risk of harm.

Moreover, TDI clearly could foresee the danger to painters working next to railroad tracks.

TDI argues that it could not have "foreseen that a boxcar door would bulge or that it could do so to such an extent that it would knock over a scaffold as the car passed" because TDI "was not an expert in the rail business, as was the" railroad. TDI, however, is not charged with the duty to foresee or correct the bulging boxcar door. Instead, it is charged with the duty to notify the railroad as to when the painters are going to be painting. TDI was only required to foresee the danger which a reasonably prudent person would have foreseen as likely to happen, and not the precise manner in which the accident actually happened. See *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 308 N.E.2d 617.

We note that TDI's contract with advertisers provided that the advertisers would "assume all expenses in connection with the painting of advertising matter on the overhead bridges, including the cost of flagman's track watching services." TDI admitted that notification on the railroad was for safety purposes, to protect the painters working next to the tracks. We reject TDI's argument that any notice to the railroad by TDI "about the presence of painters would have been superfluous" because the engineer on the train "could see the plaintiff-painters and knew they were present." The engineer's ability to look back at the 70-car train as it was passing the painters in no way obviates TDI's duty to give the railroad notice so that appropriate safety measures could be in place if found to be necessary. Proximate cause is ordinarily a question of fact for the jury, and here we cannot

say the jury's findings are against the manifest weight of the evidence. (See *Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 529, 504 N.E.2d 772.) Thus, TDI's contention that its conduct was not a proximate cause of the injuries suffered by plaintiffs is rejected.

TDI relies on *Havens v. Harris Township* (1988), 175 Ill. App. 3d 768, 530 N.E.2d 284, for the proposition that a party has no duty to warn of a condition where that party has no duty to undertake the actual improvement or correction of the condition. TDI erroneously focuses on correction of the bulging boxcar door, which plays no part in its duty here. Instead, its duty was to notify the railroad of the presence of the painters.

■■■ TDI next contends that it was prejudicial error to admit evidence of its post-occurrence adoption of a procedure notifying railroads of the presence of painters. Evidence of subsequent remedial measures is generally not admissible as proof of negligence. (*Grubb v. Illinois Terminal Co.* (1937), 366 Ill. 330, 8 N.E.2d 934.) It may be introduced, however, for the purpose of showing control (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247) and to demonstrate that the cost or convenience of remedial changes is slight in comparison to the risk of injury. *Dallas v. Granite City Steel Co.* (1965), 64 Ill. App. 2d 409, 211 N.E.2d 907.

■■■ We first note that it was the railroad, not plaintiffs, that introduced evidence of the post-occurrence remedial measure taken by TDI. And it was TDI who brought out that the purpose of the change was for safety reasons. TDI itself elicited the damaging testimony. Moreover, it is difficult to imagine plaintiffs ignoring the evidence after its admission.

Nevertheless, we find the evidence was relevant and thus properly admitted. TDI disputed whether notification to railroads was both within its control and feasible, despite the fact that it was done both before and after plaintiffs' accident, at little inconvenience or cost, especially when compared to the risk of harm to painters.

TDI relies on *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, and *Bargman v. Economics Laboratory, Inc.* (1989), 181 Ill. App. 3d 1023, 537 N.E.2d 938, to support its argument that evidence of post-occurrence changes was inadmissible. In *Schaffner*, the court distinguished 'cases where the parties dispute grounds for admissibility, such as the feasibility of a remedy. Here, control or feasibility was disputed by TDI. Moreover, in *Schaffner*, plaintiff introduced the evidence against the defendant railroad, and it was not introduced by the codefendant, Schwinn Bicycle Company.

Here, the control issue was vigorously disputed between the two defendants. With regard, to Bargman, the court there found, unlike the present case, that feasibility was admitted and not at issue.

■■ TDI finally contends that it was error to admit into evidence the contract between TDI and Pal because the contract was not in existence at the time of the accident and its later execution, on July 29, 1981, was immaterial. The contract was signed by Pal on May 26, 1981, in Gollrad's presence. Gollrad testified that once the contract was signed by Pal, they "were in business to start painting that sign." (See *Soelzer v. Soelzer* (1943), 382 Ill. 393, 47 N.E. 458; *Stuckrath v. Briggs & Turivas* (1928), 329 Ill. 555, 161 N.E. 91; *Calo, Inc. v. AMF Pinspotters, Inc.* (1961), 31 Ill. App. 2d 2, 176 N.E.2d 1.) No reversible error occurred.

For the foregoing reasons, the judgments entered by the circuit court of Cook County upon the jury verdicts in favor of plaintiffs are affirmed.

Judgments affirmed.

QUINLAN and LaPORTA, JJ., concur.